(82 Misc. Rep. 94.)

### THE TAXICAB CASES.

### YELLOW TAXICAB CO. v. GAYNOR.

(Supreme Court, Special Term, New York County.    August 21, 1913.)

1. MUNICIPAL CORPORATIONS (§ 111*)—ORDINANCES—PARTIAL INVALIDITY—EFFECT.

In a city ordinance abolishing all public hack stands theretofore designated and all special hack stands, and authorizing the mayor to locate and designate public hack stands in the public streets, and regulating the business of public hackmen, provisions relating to the disposition to be made of lost property found in cabs, and conferring upon certain police officials power to hear and determine as to violations of the ordinance, were severable from the main provisions and, if invalid, did not render the whole ordinance void.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 245–256; Dec. Dig. § 111.*]

2. CONSTITUTIONAL LAW (§ 278*)—MUNICIPAL CORPORATIONS (§ 690*)—STREETS—PERMITS TO MAINTAIN HACK STANDS—REVOCATION.

Licenses granted by a city to maintain hack stands in the public streets, which provided that they were revocable, and which were issued pursuant to an ordinance providing that the mayor should have power to revoke any such license, gave to the licensees no property rights in the street; and hence an ordinance abolishing all hack stands previously designated was not invalid as taking property without due process of law contrary to Const. N. Y. art. 1, § 6, and Const. U. S. Amends. 5 and 14.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 763, 765, 767–770, 772–777, 779–806, 808–810, 816–824, 907–924, 942; Dec. Dig. § 278;* Municipal Corporations, Cent. Dig. §§ 1490, 1491; Dec. Dig. § 690.*]

3. MUNICIPAL CORPORATIONS (§ 690*)—STREETS—PERMITS TO MAINTAIN HACK STANDS—REVOCATION.

Licenses to maintain public hack stands in the streets, which, by their terms and by the terms of the ordinance under which they were issued, were revocable, were revoked by the repeal of the ordinance pursuant to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

which they were granted, since they might be revoked indirectly as well as directly.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1490, 1491; Dec. Dig. § 690.*]

4. CONSTITUTIONAL LAW (§ 278*)—MUNICIPAL CORPORATIONS (§ 690*)—DUE PROCESS OF LAW—STREETS—USE BY ABUTTER'S LICENSEE.

Parties maintaining hack stands in the streets under contracts with the owners or licensees of abutting property had no property rights in the streets within Const. N. Y. art. 1, § 6, and Const. U. S. Amends. 5 and 14, providing that no person shall be deprived of his property without due process of law, and hence an ordinance abolishing such hack stands was not invalid, since abutting owners could not, by their private contracts, confer any right upon the hackmen inconsistent with the right of the local authorities to regulate the business of hackmen and prescribe reasonable regulations as to the use of the streets.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 763, 765, 767–770, 772–777, 779–806, 808–810, 816–824, 907–924, 942; Dec. Dig. § 278;* Municipal Corporations, Cent. Dig. §§ 1490, 1491; Dec. Dig. § 690.*]

5. CARRIERS (§ 5*)—REGULATION—HACKMEN.

The business of public hackmen is affected with a public interest and is subject to public regulation.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 3, 4, 7; Dec. Dig. § 5.*]

6. CARRIERS (§ 11*)—HACKMEN—POWER TO REGULATE.

Under Greater New York Charter (Laws 1901, c. 466) § 51, as amended by Laws 1910, c. 262, providing that subject to the Constitution and laws of the state the board of aldermen may provide for licensing and otherwise regulating the business of hackmen, cabmen, etc., and may regulate the rates of fare to be taken by the drivers or owners of hackney coaches, carriages, etc., and compel the owner thereof to pay annual license fees, and section 44, providing that the board may exercise all the powers vested in the city by proper ordinances, rules, etc., not inconsistent with the provisions of that act or the state or federal Constitution or laws, may make all such ordinances, rules, etc., as to the board may seem meet for the general good and government of the city, and may provide for the enforcement thereof by fines, penalties, etc., the board of aldermen had the power to enact an ordinance abolishing all public hack stands theretofore designated and all special hack stands, authorizing the mayor to locate and designate public hack stands in the streets and the number of hacks which should be allowed at the places designated, prescribing the maximum rates of fare for public hacks, requiring public hacks to be equipped with taximeters, prescribing the qualifications of drivers, making provision for their examination, providing for the inspection of vehicles, and providing penalties for violations thereof.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 2, 3; Dec. Dig. § 11.*]

7. MUNICIPAL CORPORATIONS (§ 591*)—LEGISLATIVE POWERS—DELEGATION.

In an ordinance regulating the business of public hackmen and providing for licensing and inspecting vehicles and examining applicants for drivers' licenses, a provision that the enforcement of the provisions thereof should be under the control of the bureau of licenses did not delegate to such bureau the question whether the ordinance should be enforced, but merely delegated to it purely administrative duties.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1310; Dec. Dig. § 591.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

8. MUNICIPAL CORPORATIONS (§ 591*)—ORDINANCES—VALIDITY—EFFECT OF IL-
LEGAL ACTS UNDER ORDINANCES.

Where a municipal ordinance regulating the business of public hackmen
conferred upon the bureau of licenses only purely administrative duties
and did not delegate to it the question of whether the ordinance should
be enforced, the fact that such bureau had suspended the operation of
some of its provisions did not render the ordinance void.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
1310; Dec. Dig. § 591.*]

9. CARRIERS (§ 2*)—HACKMEN—POWER TO REGULATE.

Greater New York Charter (Laws 1901, c. 466) § 51, authorizing the
board of aldermen to provide for licensing or otherwise regulating the
business of hackmen and to regulate the rates of fare to be taken by
owners or drivers of hackney coaches, carriages, etc., was not impliedly
repealed by Laws 1910, c. 480, § 2, subd. 9, as amended by Laws 1913,
c. 344, defining the term "common carrier" as used in that act as in-
cluding all railroad corporations, etc., and every corporation, etc., own-
ing, operating, or managing any such agency for public use in the con-
veyance of persons or property, or section 5, providing that the jurisdic-
tion, supervision, powers, and duties of the public service commission in
the first district shall extend under that chapter to any common carrier
other than a railroad or street railroad corporation operating or doing
business within that district, so far as concerns operations exclusively
within that district, especially as the charter provisions are declaratory
of powers which the city has enjoyed during its entire corporate ex-
istence.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 4, 5; Dec. Dig.
§ 2.*]

10. CARRIERS (§ 2*)—HACKMEN—POWER TO REGULATE.

Greater New York Charter (Laws 1901, c. 466) § 51, authorizing the
board of aldermen to provide for licensing or otherwise regulating the
business of hackmen and to regulate the rates of fare to be taken by
owners or drivers of hackney coaches, etc., was not repealed by Laws
1910, c. 374, amending Highway Law (Consol. Laws 1909, c. 25) § 288,
relative to the use of highways by motor vehicles, so as to provide that
except as otherwise provided local authorities shall have no power to pass
or enforce any ordinance requiring from any owner or chauffeur to whom
that article is applicable any tax, fee, license, or permit for the use of
the public highways or excluding them from the free use thereof, and
that no ordinance contrary thereto shall have any effect, "provided, how-
ever, that the power given to local authorities to regulate vehicles of-
fered to the public for hire   *   *   *   and all ordinances, rules, and reg-
ulations which may have been or which may be enacted in pursuance of
such powers shall remain in full force and effect," since not only is there
no express repeal of section 51, but the powers granted by that section
are governed by the exception contained in chapter 374.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 4, 5; Dec. Dig.
§ 2.*]

11. CARRIERS (§ 12*)—HACKMEN—POWER TO REGULATE.

Greater New York Charter (Laws 1901, c. 466) § 51, providing that the
board of aldermen shall have power to regulate the rate of fare to be
taken by owners or drivers of hackney coaches, carriages, motors, auto-
mobiles, or other vehicles, grants power to regulate rates of fare to be
charged by public hackmen expressly and not merely by inference.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20;
Dec. Dig. § 12.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

12. COMMERCE (§ 47*)—INTERSTATE COMMERCE—HACKMEN—POWER TO REGU-
LATE.
Where a city ordinance regulating the rates of fare to be charged by
public hackmen operated only within the limits of the city and did not
assume to regulate the rates for interstate commerce, it was not invalid
as regulating interstate commerce because a hackman might contract to
carry a passenger into another state.
[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 26; Dec. Dig.
§ 47.*]

13. MUNICIPAL CORPORATIONS (§ 671*)—STREETS—GRANTS OF RIGHT TO USE.
A city had power to designate public hack stands upon the public
streets without the consent of abutting owners, where the abutter's right
of ingress and egress to and from his property was not impaired.
[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
1447–1450; Dec. Dig. § 671.*]

14. MUNICIPAL CORPORATIONS (§ 671*)—STREETS—GRANTS OF RIGHT TO USE.
Under an ordinance authorizing the mayor to designate public hack
stands in the streets adjacent to property used as public parks, public
buildings, hotels, etc., but further providing that no public hack should
stand at any hack stand so designated within 15 feet of the entrance
to any building erected on the adjacent property, the establishment of
such hack stands was not per se a nuisance as impeding the abutting
owner's right of ingress and egress, since the amount of space necessary
to secure to the abutting owner such right rests within reasonable limits
within the discretion of the municipal authorities, and unless an abuse
of such discretion is clearly shown there is no excuse for judicial inter-
ference.
[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
1447–1450; Dec. Dig. § 671.*]

15. CONSTITUTIONAL LAW (§ 235*)—CARRIERS (§ 11*)—ORDINANCES—VALIDITY.
A municipal ordinance regulating the business of public hackmen was
not discriminatory within Const. U. S. Amend. 14, § 1, prohibiting any
state from denying to any person within its jurisdiction the equal pro-
tection of the laws, because it applied, not to all persons engaged in trans-
porting passengers for hire, but only to those so engaged who solicited
business upon the streets.
[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 683;
Dec. Dig. § 235;* Carriers, Cent. Dig. §§ 2, 3; Dec. Dig. § 11.*]

16. CONSTITUTIONAL LAW (§ 240*)—CARRIERS (§ 11*)—ORDINANCES—VALIDITY.
NANCES—VALIDITY.
A city ordinance regulating the business of public hackmen was not
discriminatory under Const. U. S. Amend. 14, § 1, prohibiting states from
denying the equal protection of the laws to any person within their juris-
diction because it required taximeters on motor-driven vehicles, and made
no such requirement as to horse-drawn vehicles; it being a matter of
common knowledge that the distance traveled is more easily ascertained
by the occupant of a horse-drawn vehicle than of a motor-driven vehicle.
[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 688,
692, 693, 697–699; Dec. Dig. § 240;* Carriers, Cent. Dig. §§ 2, 3; Dec. Dig.
§ 11.*]

17. CONSTITUTIONAL LAW (§ 240*)—CARRIERS (§ 11*)—ORDINANCES—VALIDITY.
NANCES—VALIDITY.
An ordinance regulating the business of public hackmen was not dis-
criminatory within Const. U. S. Amend. 14, § 1, prohibiting states deny-
ings the equal protection of the laws to any person within their jurisdic-
tion because it required taximeters on motor-driven vehicles designed to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

carry not more than four persons and made no such requirement with regard to those of a greater capacity, since the smaller cabs are more generally engaged in transient business, while vehicles designed to carry a larger number of persons are more generally employed to travel a route between known points or are employed for a definite time at an agreed rate.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 688, 692, 693, 697–699; Dec. Dig. § 240;* Carriers, Cent. Dig. §§ 2, 3; Dec. Dig. § 11.*]

18. MUNICIPAL CORPORATIONS (§ 626*)—ORDINANCES—VALIDITY.

Municipal ordinances should not be condemned as discriminatory, where they are designed to promote public convenience and whether or not they are adapted to this end rests largely within the discretion of the governing body of the city.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1380; Dec. Dig. § 626.*]

19. CONSTITUTIONAL LAW (§ 242*)—CARRIERS (§ 12*)—DISCRIMINATION—ORDINANCES—VALIDITY.

A municipal ordinance regulating the business of public hackmen was not discriminatory within Const. U. S. Amend. 14, § 1, prohibiting states from denying the equal protection of the laws to persons within their jurisdiction, because it fixed lower rates of fare for motor-driven vehicles than for horse-drawn vehicles, where it was not shown that the lower rate for horse-drawn vehicles would not result in their ceasing to exist, since there was a difference in the character of service in which the two classes of vehicles were engaged justifying their inclusion in different classes.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 691; Dec. Dig. § 242;* Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

20. CONSTITUTIONAL LAW (§ 230*)—ORDINANCES—VALIDITY.

A municipal ordinance regulating the business of public hackmen was not discriminatory within Const. U. S. Amend. 14, § 1, prohibiting the states from denying the equal protection of the law to persons within their jurisdiction, because it required the payment of a license fee of $5 for a cab, and $10 for coaches and for sight-seeing cars or those carrying more than seven persons; this being merely a classification of vehicles of different character and not discriminating against any person.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 687; Dec. Dig. § 230.*]

21. CARRIERS (§ 11*)—ORDINANCES—VALIDITY.

A provision of a city ordinance regulating the business of public hackmen, requiring the use of taximeters on motor-driven vehicles, was not unreasonable or void, but was necessary to prevent frauds.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 2, 3; Dec. Dig. § 11.*]

22. MUNICIPAL CORPORATIONS (§ 624*)—HACKMEN—POWER TO REGULATE.

A city, under its powers to regulate the business of public hackmen conferred by its charter, had power to impose penalties for failure to comply with an ordinance requiring the use of taximeters by hackmen.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1375–1377; Dec. Dig. § 624.*]

23. CARRIERS (§ 11*)—ORDINANCES—VALIDITY.

Provisions of an ordinance regulating the business of public hackmen, requiring an applicant for a driver's license to present a sworn testimonial as to his character by two reputable citizens and a further testimonial from his last employer, unless a sufficient reason was given for its omission, and authorizing the mayor to suspend or revoke a driver's

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

license, were not unreasonable, being designed to afford protection to those using hacks.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 2, 3; Dec. Dig. § 11.*]

24. CARRIERS (§ 11*)—ORDINANCES—VALIDITY.
A provision of an ordinance regulating the business of public hackmen, that no person shall solicit passengers for a public hack upon the streets except the driver while sitting upon the box of his vehicle, is not unreasonable, being designed to prevent the annoyance of those near hack stands and to prevent drivers from congregating upon the sidewalk in front of hotels and other public buildings.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 2, 3; Dec. Dig § 11.*]

25. CARRIERS (§ 11*)—ORDINANCES—VALIDITY.
A provision of an ordinance regulating the business of public hackmen, prohibiting any one riding on the seat with the driver, was a reasonable police regulation, especially where it appeared that it was not adopted arbitrarily, but to prevent robberies and assaults by hackmen with the assistance of companions.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 2, 3; Dec. Dig. § 11.*]

26. CARRIERS (§ 18*)—CHARGES—ENFORCEMENT OF REGULATION—PRELIMINARY INJUNCTION.
Where, on a motion for an injunction pendente lite to restrain the enforcement of a city ordinance prescribing rates of fare to be charged by hackmen, the affidavits presented a sharp conflict of fact as to whether hacks could be operated at a profit at such rates, this fact would not be determined upon affidavits upon a preliminary hearing in advance of the trial.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

27. CARRIERS (§ 12*)—REGULATION—RATES OF FARE.
Rates of fare to be charged by hackmen, prescribed by a city ordinance, which would permit a fair profit for the service rendered, were not confiscatory and unreasonable because they would not also yield a fair return upon all the property employed by the corporation rendering the service.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

Actions by Yellow Taxicab Company, Hotel Astor, Universal Taximeter Cab Company, Hilliard Hotel Company, and Motor Taximeter Cab Company, respectively, against William J. Gaynor, as Mayor of the City of New York, and others, and by Hotel Woodward Company, Garden Taxicab Company, Waldorf-Astoria Hotel Company, Hawk & Wetherbee, Mason-Seaman Transportation Company, Haverty's Taxicabs, Incorporated, Jennie K. Stafford, doing business under the firm name and style of Robert Stafford, Greeley Square Hotel Company, the New Taxicab & Auto Company, Forty-Seventh Street Taxicab Company, and Riverside Taxi Service Company, respectively, against the City of New York and others. On motion by the plaintiff in each case for an injunction pendente lite. Motions denied, and temporary injunctions vacated.

Leary & Goodbody, of New York City, Edgar T. Brackett, of Saratoga Springs, and Edward W. Hatch, Samuel F. Moran, Arthur K.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

Wing, and Henry Bennet Leary, all of New York City (William U. Goodbody, of New York City, of counsel), for plaintiff Yellow Taxicab Co.

Dixon & Holmes, of New York City, for plaintiff Hotel Astor.

Wing & Wing, of New York City, for plaintiff Universal Taximeter Cab Co.

Baldwin & Hutchins, of New York City, for plaintiff Hilliard Hotel Co.

Harvey T. Andrews, of New York City, for plaintiffs Motor Taximeter Cab Co. and Forty-Seventh Street Taxicab Co.

Campbell & Boland, of New York City, for plaintiff Hotel Woodward Co.

Green & Barry, for plaintiff Garden Taxicab Co.

Baldwin & Hutchins, of New York City, for plaintiff Waldorf-Astoria Hotel Co.

Corbitt & Stern, of New York City, for plaintiffs Hawk & Wetherbee and Mason-Seaman Transp. Co.

John W. Browne, of New York City, for plaintiff Haverty's Taxicabs, Inc.

Stephen Barker, of New York City, for plaintiff Jennie K. Stafford.

Hatch & Sheehan, of New York City, for plaintiff Greeley Square Hotel Co.

George C. Norton, of New York City, for plaintiff New Taxicab & Auto Co.

Atkins B. Cunningham, of New York City, for Riverside Taxi Service Co.

Archibald R. Watson, Corp. Counsel, of New York City (Terence Farley and George P. Nicholson, both of New York City, of counsel), for defendants.

SEABURY, J.   Sixteen motions in as many cases were argued and submitted to the court for decision at the same time.  The object of the plaintiffs in all of these motions is to secure an injunction pendente lite in actions brought to restrain the defendants from attempting to enforce a certain ordinance passed by the board of aldermen of the city of New York, known as the "Public Hack Ordinance." The ordinance was approved by the mayor of the city on June 2, 1913, and by its terms was to become operative on August 1, 1913.   The motion in each case is based upon the contention that the ordinance is unconstitutional, beyond the power of the board of aldermen, discriminatory, unjust, and unreasonable, and therefore void.

The plaintiffs in these cases are of two classes:   First, certain taxicab owners engaged in transporting persons for hire; and, second, certain persons engaged in the operation of hotels in front of which the defendants, acting pursuant to the ordinance referred to, have assumed to establish public hack stands.   While these two classes of persons claim to be affected in a different manner by the enforcement of the ordinance, all of the plaintiffs assert the invalidity of the ordinance upon the same grounds.   The court will determine all of the

motions and discuss the grounds urged in support of each in a single opinion.

The plaintiffs engaged in the operation of taxicabs have paid to the city a license fee of $10 for each cab employed in its business, and for each stand an amount equal to as many times $25 as cabs are allowed on such stand. Some of the licenses issued to these plaintiffs expire by their terms on August 1, 1913, and others according to their terms continue beyond this date. Each license states that in consideration of $25 the person named "is hereby licensed to keep and use a special hack stand in the city of New York at" a designated place, and provides that:

"This license is subject to the strict observance of all laws, ordinances and regulations enacted for the protection of the city so far as they may apply, is to continue in force for a period of one year, beginning * * * and ending, * * * unless sooner suspended or revoked, and is not transferable."

Section 307 of the ordinances in effect up to and including July 31, 1913, provides as follows:

"All licenses shall be granted by authority of the mayor and issued by the bureau of licenses for a term of one year from the date thereof, unless sooner suspended or revoked by the mayor, and no person shall be licensed except a citizen of the United States or one who has regularly declared intention to become a citizen. *The mayor shall have power to suspend or revoke any license or permit issued under the provisions of this ordinance.*"

Those of the plaintiffs who are proprietors or lessees of hotels and are engaged in the business of operating the same assert that they have under contracts with cab companies been enabled to afford to their patrons and guests a taxicab service which has been satisfactory and responsible; and that the mayor, pursuant to the ordinance, has located a public hack stand alongside of the curb of the street upon which their hotels front; and that the new ordinance which is now under review does not provide as a condition precedent to the designation of a public hack stand in front of such hotels that the consent of the occupant, owner, or lessee must be obtained. These plaintiffs have not given their consent to the designation of public hack stands in front of their respective premises.

The ordinance the validity of which is assailed in these actions purports to abolish all public hack stands heretofore designated and all special hack stands. It authorizes the mayor to locate and designate as public hack stands the space alongside the curb adjacent to property used as public parks, public buildings, railroad stations, steamship and ferry landings, hotels, restaurants, theaters, and the center of any street or avenue where the roadway exclusive of the sidewalk is 30 feet in width or more (article 5, subds. 1, 2, and 3). The ordinance gives to the mayor the power to designate the number of public hacks which shall be allowed at the places designated (article 5, subd. 4), and prescribes the maximum rates of fare for public hacks (article 6). The maximum rates of fare for motor vehicles is made to depend on the number of passengers carried and the distance traveled (article 6). The ordinance provides that every public hack propelled by mechanical power and seating four persons or less must have a taximeter (article 3, subd. 2). The ordinance also prescribes

the qualifications of drivers of public hacks, and makes provision for the examination of applicants for a driver's license (article 4). It also provides for the inspection of the vehicles to ascertain whether their character and condition conform to the requirements of the ordinance (article 3). The ordinance provides penalties for the violation of any of its provisions.

On the same day that the ordinance was adopted the board of aldermen passed a separate act repealing sections of a former code of ordinances under which all previous hack licenses had been granted. This repealing ordinance was approved by the mayor on the same day that he approved the public hack ordinance, and both ordinances by their terms were to become operative at the same time.

[1] In determining the questions presented the court must keep in mind the well-settled principle of law that the fact that there may be void provisions of a statute or ordinance furnishes no reason for declaring the whole statute or ordinance void. Some of the provisions of the ordinance attacked upon these motions may be open to question. Thus, those provisions of the ordinance which provide for the disposition to be made of lost property found in cabs and the powers conferred upon certain police officials to hear and determine as to violations of the ordinance contain provisions which are easily severable from the main provisions of the ordinance. The validity of these provisions is in no way involved in these actions, and the court should not go out of its way to anticipate controversies which may not arise. If any such controversies do arise in the administration of the ordinance, the persons who claim that their rights have been invaded will have access to adequate legal remedies. Upon these motions, therefore, the court is to consider only those objections to the ordinance which the plaintiffs claim threaten them with injuries against which they would be remediless if injunctive relief is denied. The claims of the plaintiffs which it is necessary for the court to pass upon are those which rest upon the contention that the ordinance is violative of the Constitution of the state and of the provisions of the fifth and fourteenth amendments to the Constitution of the United States; that the board of aldermen was without legal power to enact it; that it violates the rights of owners or lessees whose property abuts the curb in front of which public hack stands are attempted to be established without the consent of such owners or lessees; and that it is discriminatory and unjust and unreasonable. These objections we shall consider in the order named.

[2] The claim that the ordinance violates the provisions of the state Constitution (article 1, § 6) and the provisions of the Constitution of the United States expressed in the fifth and fourteenth amendments is necessarily based upon the assumption that those of the plaintiffs who are engaged in the transportation of passengers for hire have already by contract with the city of New York acquired certain property rights which cannot be impaired by the repeal of the ordinances under which permits were granted to them to occupy special hack stands heretofore designated. It becomes necessary, therefore, at the outset to ascertain what rights, if any, this class of plaintiffs have to occupy such private or special hack stands. The permits to them

were granted under the provisions of an ordinance which prohibited other licensed hackmen from going upon or using a special or private hack stand. Sections 317 and 318 of the Code of Ordinances. The effect of those provisions of the old ordinance and the licenses granted pursuant thereto gave to hotels and other owners of buildings abutting on the public streets the right to maintain private hack stands. These special privileges in the streets of the city enabled those in front of whose property special hack stands were established to sell for their private profit the right to use a part of the public streets. Licenses issued pursuant to such ordinances discriminated against the right of other public hackmen than those who made contracts with the abutting owners to enjoy equal rights in the public streets. It is in evidence before the court that an investigation made by a commissioner of accounts of the city of New York shows that over $360,000 is paid annually to the hotels and other abutting owners for the sale of these privileges, and the report of a commission appointed by the mayor to investigate the whole subject of cab service estimated the amount paid annually for such purposes as not less than $500,000.

Because of the discrimination which licenses issued under the old ordinance permitted against other hackmen than those who sustained contractual relations with the abutting owners its validity is not free from doubt. Penn. Co. v. City of Chicago, 181 Ill. 289, 54 N. E. 825, 53 L. R. A. 223; Odell v. Bretney, 38 Misc. Rep. 603, 78 N. Y. Supp. 67; Id., 62 App. Div. 595, 71 N. Y. Supp. 449; Id., 93 App. Div. 607, 87 N. Y. Supp. 655; Montana Union Ry. v. Langois, 9 Mont. 419, 24 Pac. 209, 8 L. R. A. 753, 18 Am. St. Rep. 745, and authorities therein cited. Notwithstanding the reasons suggested by these decisions against the validity of the ordinance in question, it has been upheld in the case of City of N. Y. v. Reesing, 38 Misc. Rep. 129, 77 N. Y. Supp. 82, affirmed 77 App. Div. 417, 79 N. Y. Supp. 331. This latter case is binding as an authority upon this court and compels it to indulge the assumption that the ordinance under which the licenses were granted to those of the plaintiffs engaged in business of the transportation of passengers for hire was a valid ordinance while it remained unrepealed. This assumption necessitates an inquiry into the nature of the rights conferred under the licenses granted pursuant to those provisions of the old Code of Ordinances referred to. It has been pointed out above that the ordinance under which licenses were formerly issued and the licenses in terms provided that such licenses should be revocable by the mayor. The licenses were not contracts with the city of New York. They conferred no right of property in the street. They were mere permits granting privileges to render public service. The right to revoke such a license is the correlative of the right to grant it. 25 Cyc. 625.

The authorities are uniform that such licenses are not contracts and create no property right and are always revocable. Calder v. Kurby, 71 Mass. (5 Gray) 597; People v. Roper, 35 N. Y. 629, 635; Laing v. Mayor and Council of Americus, 86 Ga. 756, 13 S. E. 107; Sullivan v. Borden, 163 Mass. 470, 40 N. E. 859; St. Charles v. Hackman, 133 Mo. 634, 34 S. W. 878; Newson v. City of Galveston, 76 Tex. 559, 13 S. W. 368, 7 L. R. A. 797; Chief of Police of City of

Providence v. Bemus, 17 R. I. 230, 231, 21 Atl. 539, 12 L. R. A. 57; Sights v. Yarnalls, 53 Va. 292; Hutchins v. Town of Durham, 118 N. C. 457, 469, 24 S. E. 723, 32 L. R. A. 706; Wiggins v. City of Chicago, 68 Ill. 372; Schwuchow v. City of Chicago, 68 Ill. 444.

[3] A license by its terms revocable, granted pursuant to an ordinance which is repealed, falls with the ordinance which furnished the only authority for granting it. Such revocable municipal licenses may be revoked indirectly as well as directly. Laing v. Mayor and Council of Americus, 86 Ga. 756, 13 S. E. 107; People v. Meyer (Sup.) 5 N. Y. Supp. 69. From these authorities it is clear that the licenses heretofore granted were revoked by the repeal of the ordinance pursuant to which they were granted. The argument of the plaintiffs that the ordinance violates its property rights contrary to the constitutional provisions referred to is based entirely upon a fallacy. These permits, instead of being contracts, as claimed by the plaintiffs, are mere licenses revocable by the power which granted them, and, in fact, by the repeal of the ordinance pursuant to which they were issued, have been revoked. These plaintiffs, therefore, have no greater rights than if no permits had ever been issued to them. They have no property rights in the city's streets which have been impaired by the ordinance, and no property which the ordinance confiscates or attempts to take away.

[4] There is no merit in the claim that they have rights by virtue of contracts which they have made with the owners or lessees of property abutting pon the curb in front of which special hack stands were formerly established. Whatever the rights of such abutting owners may be, it is clear that they cannot by their private contracts with hackmen confer any right upon them which is inconsistent with the right of local authorities to regulate the business of hackmen and prescribe reasonable regulations as to the use of the streets. Moreover, it follows from the conclusion announced that the claim of the plaintiffs that the rates of fare prescribed by the ordinance are confiscatory is without merit and not to be considered, except in so far as the reasonableness of the rates prescribed is to be taken into account in determining the general question as to whether the ordinance is itself unreasonable and unjust.

[5] This aspect of the plaintiffs' contention we shall subsequently consider. The assumption of the plaintiffs that public hackmen are in the same class as those engaged in private business is without foundation and is contrary to fundamental principles embodied in the common law and in our present constitutional provisions. From time immemorial it has been held that the business of a public hackman is affected with a public interest and falls within the principle of the common law which was long ago asserted by Lord Chief Justice Hale in his treatise De Portibus Maris (Harg. Law Tracts, 78). The underlying principle there asserted was that businesses of certain kinds sustain such a peculiar relation to the public interests that there is superinduced upon them the right of public regulation. This principle is firmly fixed in our modern constitutional law. People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682, 5 L. R. A. 559, 15 Am. St. Rep. 460, af-

firmed Budd v. N. Y., 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247;
Munn v. Ill., 94 U. S. 113, 24 L. Ed. 77. As was well said by Chief
Justice Waite in Munn v. Ill., supra, in the exercise by government of
the power of regulation—

"it has been customary in England from time immemorial, and in this coun-
try from its first colonization, to regulate ferries, common carriers, *hackmen*,
bakers, millers, wharfingers, innkeepers, and so forth, and in so doing to fix
a maximum of charge to be made for services rendered, accommodations fur-
nished, and articles sold."

It has repeatedly been asserted that such persons stood "in the very
gateway of commerce and took a toll from all who passed," and that
their business tended "to a common charge" and had become a thing
of public interest and use, and for that reason ought to be subjected to
governmental regulation so that they shall be enabled to "take but
reasonable toll." The question as to what is a "reasonable toll" is a
legislative rather than a judicial question. These views are so abund-
antly fortified by the opinion of the court in Budd v. New York, 143
U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247, and the cases therein cited,
that amplification is unnecessary.

[6] The plaintiffs contend that the board of aldermen were with-
out power to enact the public hack ordinance and that the ordinance
is void for that reason. This contention is without merit. The stat-
utory authority of the board of aldermen to enact the ordinance is
clearly set forth in the Greater New York Charter (Laws 1901, c. 466).
Section 51 of that charter, as amended by chapter 262 of the Laws
of 1910, provides as follows:

"Subject to the Constitution and laws of the state, the board of aldermen
shall have power to provide for the licensing and otherwise regulating the
business of. * * * hackmen, cabmen. * * * The board of aldermen
shall also have power to regulate the rates of fare to be taken by owners or
drivers of hackney coaches, carriages, motors, automobiles or other vehicles,
and to compel the owners thereof to pay annual license fees. All ordinances
in relation to any of the matters mentioned in this section shall be general,
shall provide for the enforcement thereof in the manner specified in section
44 of this act as amended, and shall fix the license fee to be paid, if any. All
licenses shall be according to an established form, and shall be regularly
numbered and duly registered as provided by the board of aldermen."

Section 44 of the charter provides that:

"No enumeration of powers in this act shall be held to limit the legislative
power of the board of aldermen," except as to this act specifically provided,
and the board of aldermen, "in addition to all enumerated powers, may exer-
cise all of the powers vested in the city of New York by this act, or other-
wise, by proper ordinances, rules, regulations and by-laws not inconsistent
with the provisions of this act, or with the Constitution or laws of the United
States or of this state; and, subject to such limitations, may from time to
time ordain and pass all such ordinances, rules, regulations and by-laws, ap-
plicable throughout the whole of said city or applicable only to specified por-
tions thereof, as to the said board of aldermen may seem meet for the good
rule and government of the city, and to carry out the purposes and provi-
sions of this act or of other laws relating to the said city, and may provide
for the enforcement of the same by such fines, penalties, forfeitures and im-
prisonment as may by ordinance or by-law be prescribed."

The right of a municipality to establish public hack stands has been
recognized and acted upon by the city of New York from early times,

and is but an incident of the right to license and regulate those who·
ply the trade of hackmen for hire.   The defendants have submitted
upon these motions a record of municipal ordinances from 1817 to
date, which demonstrate that the corporate authorities of the city have
from such time exercised such power as a part of its police functions.

[7] The fact that the ordinance provides that "the enforcement of
the provisions of this ordinance shall be under the control of the
bureau of licenses" does not justify the contention urged·by the plain-
tiffs that the board of aldermen have delegated to such bureau "the
question of whether the ordinance shall be enforced at all or not."
There is nothing in the ordinance which justifies such an interpreta-
tion being placed upon its provisions.   Manifestly the board of alder-
men cannot itself attend to the work of licensing and inspecting
vehicles and conduct the examination of applicants for drivers' licens-
es.   The duties which the ordinance confers upon the bureau of li-
censes are purely administrative in character and not legislative.   The
board of aldermen exercised its legislative function in enacting the
ordinance.   No discretion is delegated to the bureau of licenses to
determine whether or not the ordinance should become operative.
That it should become operative followed as a matter of course from
the fact that it was enacted by the board of aldermen and approved by
the mayor, unless the ordinance is itself illegal.

[8] The claim that the chief of the mayor's bureau of licenses has
in effect suspended the operation of some of the provisions of the
ordinance is not a proper subject of consideration upon these mo-
tions.   If the fact be as alleged, there are remedies open to the plain-
tiffs, but that fact would furnish no ground for declaring the ordi-
nance itself void.

[9] The·claim that those of the plaintiffs engaged in the transporta-
tion of passengers for hire are subject to the exclusive jurisdiction
of the Public Service Commission in the First District by virtue of
subdivision 9 of section 2 of chapter 480 of the Laws of 1910 (Consol.
Laws 1910, c. 48), as amended by chapter 344 of the Laws of 1913,
and that therefore the board of aldermen is without power to enact
the ordinance, is unsound and can only be sustained by a process of
reasoning which assumes that the Legislature in enacting chapter 344
of the Laws of 1913 intended to repeal those provisions of the charter
which conferred upon the board of aldermen the right to regulate hack-
men and the rates of fare to be charged by them.   Such an interpre-
tation not only does violence to that canon of statutory construction,
which holds that repeal by implication is not favored, but finds no
support in anything contained in the act of 1913 referred to·above.
The provisions of that act, which provide that the jurisdiction of the
Public Service Commission in the First District "shall extend under
this chapter * * * (D) to any common carrier other than a rail-
road corporation or street railroad corporation operating or·doing
business within the district, so far as concerns operation exclusively
within that district," does not justify the inference that the Legislature
intended to repeal sections 51 and 44 of the Greater New York Char-
ter, which confer in unequivocal terms the authority upon the city to

enact ordinances regulating the business of hackmen. These charter provisions are but declaratory of powers which the city of New York has enjoyed during its corporate existence, and in the absence of a clear legislative intent it is not to be assumed that the Legislature intended to repeal them.

[10] The contention that section 51 of the charter has been repealed by chapter 374 of the Laws of 1910, amending section 288 of the Highway Law (Consol. Laws 1909, c. 25), is fallacious.

The amendment made to section 288, upon which the plaintiffs base their claim, so far as applicable to the question under consideration, provides as follows:

"Except as herein otherwise provided, local authorities shall have no power to pass, enforce or maintain any ordinance, rule or regulation requiring from any owner or chauffeur to whom this article is applicable any tax, fee, license or permit for the use of the public highways, or excluding any such owner or chauffeur from the free use of such public highways, excepting such driveway, speedway or road as has been or may be expressly set apart by law for the exclusive use of horses and light carriages or in any other way respecting motor vehicles or their speed upon or use of the public highways; and no ordinance, rule or regulation contrary to or in anywise inconsistent with the provisions of this article, now in force or hereafter enacted, shall have any effect; provided, however, that the power given to local authorities to regulate vehicles offered to the public for hire, and processions, assemblages or parades in the streets or public places, and all ordinances, rules and regulations which may have been or which may be enacted in pursuance of such powers shall remain in full force and effect."

That this law does not contemplate taking away from the local authorities the right to regulate the business of hackmen and cabmen appears not only from the language used and the absence of any express repeal of section 51 of the charter, but also from the exception contained in the law itself. The present ordinance falls within the terms of the exception, which provides:

"That the power given to local authorities to regulate vehicles offered to the public for hire, * * * and all ordinances, rules and regulations which may have been or which may be enacted in pursuance of such powers shall remain in full force and effect."

To imply a repeal of section 51 of the charter from this language would be to act in defiance of the expressed intent of the Legislature to the contrary. The amendment made to section 288 of the Highway Law was not intended as a substitute for those charter provisions which equip the city with authority to exercise its police power in reference to those trades and callings which have for many generations been deemed proper subjects for the exercise of such power. The fact that the provisions contained in section 288 of the Highway Law reserves the right "to regulate vehicles offered to the public for hire" and is there expressed in different phraseology from that employed in section 51 of the charter is a circumstance wholly insignificant. The phraseology employed is immaterial when the intent is clearly expressed, and an intention not to repeal section 51 of the charter affirmatively appears in the amendment to section 288 of the Highway Law.

[11] The contention that the power to fix rates must be expressly given and cannot be inferred is inapt in view of the provision of section 51 of the charter that:

"The board of aldermen shall also have power to regulate the rates of fare to be taken by owners or drivers of hackney coaches, carriages, motors, automobiles or other vehicles."

It is difficult to see how the Legislature could have expressed more clearly a direct grant of power.

[12] The objection that the board of aldermen is without power to regulate rates because a hackman might contract to carry a passenger from New York to Jersey City, and thus engage in interstate commerce, the power to regulate which rests solely in the Congress of the United States, is without merit. The objection seems to me to be frivolous in view of the fact that the ordinance does not assume at all to regulate the rates for interstate commerce. The ordinance in question operates only within the limits of the city, and therefore cannot be held obnoxious as a regulation of interstate commerce. Budd v. New York, 143 U. S. 517, 545, 12 Sup. Ct. 468, 36 L. Ed. 247. The attempt to show that the ordinance is in excess of the power of the board of aldermen cannot survive an examination of the statutes and the application to them of any reasonable interpretation.

[13] All of the plaintiffs in these actions urge that the provisions of the ordinance permitting the establishment of a public hack stand in front of hotels without the consent of owners or lessees of such property is in violation of the right of such owners or lessees and renders the ordinance void. Those of the plaintiffs who are engaged in the business of transportation of passengers for hire claim the right to assert this objection because at the present time, by leave of the owners, they are enjoying the privileges of a private hack stand in front of such hotels. The other plaintiffs are the owners or lessees of hotels or other property abutting upon the streets in front of which the mayor has designated a place for a public hack stand. There is no doubt of the right of the city of New York to designate public hack stands upon the public streets. Such stands are not per se a nuisance. They do not interfere with the street for street purposes, but, on the contrary, facilitate the use of the street for such purposes. The right to establish such public hack stands existed under the ancient charters of the city of New York and has been confirmed by subsequent legislation. The opinion of Judge Jones in Masterson v. Short, 30 N. Y. Super. Ct. 241, and the opinion of Judge Barbour in the same case (Id., 30 N. Y. Super. Ct. 299), although differing as to whether such stands may under the circumstances disclosed in that case create a nuisance, are agreed in asserting the right of the corporate authorities to license hackney coaches and to designate portions of the public streets as the standing places thereof. The object and reason for such regulation was well stated by Judge Jones in his opinion, where he said:

"The system of hackney coaches standing at designated places in the streets of the city grew out of the necessity of meeting the public demands. A de-

mand arose in cities for means of transit, from point to point, other than by walking. As the city increased in extent of territory, and became more populous, the demand increased. This gave rise to a class of men, who procured one or more vehicles, according to their means, and plied the streets for hire. It was soon found necessary to place these men under special police regulations, and, as one of those regulations, to assign certain places in the streets where they might stand waiting for customers. Such regulation was necessary for the control of the hackmen, and for the convenience of the public. Its object was to prevent the hackmen from traveling, with their empty vehicles, in search of custom in the streets, otherwise sufficiently crowded, and also to prevent their stopping and remaining, for any considerable time, at inconvenient places; but the great object was to have hacks standing at various points where the public would be most likely to want them, and where they would cause the least inconvenience to other vehicles or injury to the surrounding property."

If the municipal authorities have the right to establish public hack stands, as they undoubtedly have, it follows that they have the right to establish such stands at such places as the public welfare and convenience shall require. The designations pursuant to the ordinance (article 5, § 3) of spaces alongside the curb adjacent to property used as public parks, public buildings, railroad stations, steamships and ferry landings, hotels, restaurants, and theaters, are obviously conducive to the public convenience. Such a designation is not therefor in itself either invalid or unreasonable. That such a designation must be made with due regard to the rights of abutting owners is clear, but if such designation does not impair the rights of such owners there can be no legal objection urged against it. It is settled law that a court of equity will withhold injunctive relief where there is no substantial injury to the easements of light, air, and access to the premises of an abutting owner. Adler v. M. E. R. Co., 138 N. Y. 173, 180, 33 N. E. 935.

The statement of the plaintiffs that the designation of such public hack stands in front of the property of an abutting owner or occupier without the latter's consent is a nuisance and illegal is too broad a statement of the rule of law applicable to this subject to be accurate. The rights of an abutting owner are not paramount to the rights of others of the general public to use the streets for legitimate street purposes. Donovan v. Pennsylvania Company, 199 U. S. 279, 303, 26 Sup. Ct. 91, 50 L. Ed. 192. The abutting owner has rights special and peculiar to himself which arise out of the relation of his property to the public street. His right of way and his right to the free and unimpeded ingress and egress to and from his property and to the easements appurtenant thereto are clearly recognized by controlling legal authorities. 2 Dillon, Municipal Corporations (5th Ed.) §§ 1016, 1125, and cases cited; 28 Cyc. 856. A legislative act or municipal ordinance which substantially interferes with this right violates the property right of the abutting owner, whether the fee of the street is owned by the abutting owner or the public. Donovan v. Pennsylvania Co., supra, 199 U. S. 279, 302, 26 Sup. Ct. 91, 50 L. Ed. 192; Story v. Elevated R., 90 N. Y. 122, 43 Am. Rep. 146. The rights of the abutting owner are of course subject to such valid regulations as the local authorities may prescribe for the public convenience, but such regulations in order to be valid must recognize the rights of the

abutting owner of ingress to and egress from his property. In Don-
ovan v. Pennsylvania Co., supra, Mr. Justice Harlan said:

"Generally speaking, public sidewalks and streets are for use by all, upon
equal terms, for any purpose consistent with the object for which such side-
walks and streets are established; subject of course to such valid regulations
as may be prescribed by the constituted authorities for the public conven-
ience; this to the end that, as far as possible, the rights of all may be con-
served without undue discrimination."

If the ordinance now under review, in authorizing the establish-
ment of public hack stands alongside of the curb in front of the plain-
tiffs' hotels does not impair the free and unimpeded right of ingress
and egress to and from the property of the plaintiffs, the regulation
is valid and violates no right of any abutting owner.

[14] The framers of the ordinance seem to have had these prin-
ciples well in mind and to have endeavored to make the establishment
of a public hack stand consistent with a recognition of the special and
peculiar rights of abutting owners. Thus in secton 7, art. 5, of the
ordinances, it is provided that:

"No public hack shall stand at any hack stand located and designated
by the mayor in accordance with section 3 of this article, adjacent to the
curb of the sidewalk, within fifteen feet of the entrance to any building erected
on the property adjacent to the said hack stand. The said fifteen feet shall
be determined by measuring fifteen feet on each side of a point on the curb
opposite the middle of the entrance to the adjacent building. No hack shall
stand within five feet of any crosswalk."

The ordinance under review therefore specifically sets aside thirty
feet in front of the property of the abutting owner for the special
uses of such owners and permits no public hack stand to be desig-
nated within this space. It is not claimed that the municipal author-
ities have designated any stand in violation of this provision. The
amount of space necessary to secure to the abutting owner the free
and unimpeded right of ingress and egress to and from his property
must always rest within reasonable limits within the discretion of the
municipal authorities. Unless the ordinance and the acts of the de-
fendants done or threatened pursuant thereto clearly show such an
abuse of discretion as leaves no doubt that the rights of the abutting
owner have been violated, there is neither reason nor excuse for judi-
cial interference. It is not claimed that the agents of the defendants
will not observe the requirements of the ordinance in this respect,
and, if they should disregard the limitations imposed by the ordinance,
it is to be presumed that the local authorities will restrain them. The
amount of space necessary to be kept free of the presence of public
hacks in order to conserve the rights of the abutting owners or occu-
pants is primarily to be determined by the board of aldermen and not
by the courts. Bearing in mind the provisions of the ordinance which
set aside 30 feet in front of the property of those of the plaintiffs who
own or lease the hotels in front of which public hack stands have
been designated, it is impossible for the court to determine that the
establishment of such stands is per se a nuisance, or that the right of
these plaintiffs to the free and unimpeded ingress and egress to and
from their property is in any way impaired. Nor is there anything

in the affidavits submitted upon these motions which tends to a contrary conclusion.

That the rule here applied is in harmony with the weight of legal and judicial authority conclusively appears from an examination of the writings of learned commentators and judges. In Dillon on Municipal Corporations (5th Ed. vol. 3, § 1167), the rule is thus stated:

"Generally speaking, public sidewalks and streets are for use by all, upon equal terms, for any purpose consistent with the object for which such sidewalks and streets are established, subject, of course, to such general regulations as may be prescribed by the constituted authorities for the public convenience, to the end that as far as possible the rights of all may be conserved without undue discrimination. Licensed hackmen and cabmen, unless forbidden by valid local regulations, may within reasonable limits use a public sidewalk in prosecuting their calling, provided such use is not materially obstructive in its nature; that is, of such exclusive character as in a substantial sense to prevent others from also using it upon equal terms for legitimate purposes. By virtue of its power to regulate the use of streets and sidewalks and to regulate hackmen and so forth the city council may provide for public hack stands in the city streets and may prescribe the length of time that hackmen may stand thereat. But it is not within the power of the municipality to authorize the creation or maintenance of a hack stand of such a nature as to interfere with the ingress to and egress from abutting property, nor can the establishment of a hack stand by municipal ordinance be used as a justification for the acts of hackmen in congregating upon the sidewalk in front of and adjacent to or about the abutting premises so as to interfere with the ingress or egress of persons desiring to visit the same. Similarly hotel keepers and other property owners may make such reasonable use of the street adjoining the hotel or property as is reasonably necessary for the purpose that enabled them to keep carriages for the use of their guests on call."

In 2 Elliott on Roads & Streets (3d Ed.) § 883, it is said:

"Municipal corporations often enact ordinances setting apart certain places for coaches, hacks or express wagons to stand, and the validity of such ordinances does not seem often to have been questioned. If the easement of access is not interfered with it may be that the abutter could not ordinarily enjoin such a use of the street."

In City Council of Montgomery v. Parker, 114 Ala. 118, 21 South. 452, 62 Am. St. Rep. 95, it was held that a municipal ordinance providing that a portion of a street in front of a designated hotel shall be "established as a stand for two hacks" was within the power of the municipality, not unreasonable, and that the penalties prescribed for a violation thereof were enforceable. The opinion of the court makes it clear that provided such stand does not obstruct the property and guests of a hotel which abuts such street in their reasonable ingress to and egress from the hotel and in the transportation of baggage no ground for injunctive relief is presented.

In Veneman v. Jones, 118 Ind. 41, 20 N. E. 644, 10 Am. St. Rep. 100, the court said:

"There can be no question but that the ordinance authorizing the depot marshal to prescribe the places where omnibuses, hacks, and other vehicles should stand at the railroad depot, and requiring drivers to obey the directions of police officers in regard to the places which their respective vehicles should occupy, was a proper regulation, and one which the municipal authorities had the power to pass. City of St. Paul v. Smith, 27 Minn. 364 [7 N. W. 734, 38 Am. Rep. 296]; Commonwealth v. Robertson, 5 Cush. [Mass.]

438; Commonwealth v. Stodder, 2 Cush. [Mass.] 562 [48 Am. Dec. 679]. Such regulations tend to the convenience of the general public by protecting persons from the annoying solicitations of hackmen and others, who, when acting without restraint, often confuse travelers, besides engendering strife and contention among themselves."

In Pennsylvania Co. v. City of Chicago, 181 Ill. 289, 54 N. E. 825, 53 L. R. A. 223, it was held that railroad depots in cities are in the nature of public buildings, and the city council may establish hack stands in front of them so long as access to and egress from the building is not prejudicially interfered with.

In Donovan v. Pennsylvania Co., 199 U. S. 279, 303, 26 Sup. Ct. 91, 98 (50 L. Ed. 192), Mr. Justice Harlan says:

"By the Illinois statutes it is provided that the city council in cities may regulate the use of streets and sidewalks, and license, tax, and regulate hackmen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and to prescribe their compensation. Hurd's Ill. Stat. 1901, pp. 285, 287. And by ordinance of the city council of Chicago it is provided that 'any licensed hackney, coach, cab or other vehicles for the conveyance of passengers may stand, while waiting for employment, at the following places, and for the period of time hereinafter provided: * * * Stand No. 4. The east side of Canal street, occupying 110 feet between Adams and Madison streets, as the superintendent of police shall direct. * * * Stand No. 6. At all railroad depots ten minutes previous to the arrival of all passenger trains.' Rev. Code of Chicago, § 498. The validity of this ordinance has been sustained by the Supreme Court of Illinois. Pennsylvania Co. v. Chicago, 181 Ill. 289 [54 N. E. 825, 53 L. R. A. 223]."

After making this statement Mr. Justice Harlan adds the following significant sentence:

"Perceiving nothing in the above provisions inconsistent with any right secured by the Constitution of the United States, we accept the decision of the state court as authoritative upon this point."

These authorities and the others referred to in them leave no doubt in the mind of the court that the ordinance in question in so far as it permits the establishment of public hack stands in front of the hotels of some of these plaintiffs is a police regulation which offends against no constitutional provision and does not impair the rights of easement which the owners abutting on the street possess.

The decision in McCaffrey v. Smith, 41 Hun, 117, upon which these plaintiffs place great reliance, does not seem to me to be contrary to the authorities cited, because in that case the stand in front of the plaintiff's premises "interferes somewhat with access to the hotel and premises of the plaintiff." Upon the facts before the court the actual decision in McCaffrey v. Smith, supra, may be sustained, although I think that the authorities cited above demonstrate that the rule declared in the opinion in that case is too broadly stated to be an accurate statement of the law governing this subject.

It is further contended by the plaintiffs in these actions that the ordinance is unreasonably discriminatory in its provisions, and that therefore it violates the provisions of section 1 of the fourteenth amendment of the Constitution of the United States, which prohibits any state from denying to any person within its jurisdiction the equal protection of the laws. The respects in which it is claimed that the

ordinance is unreasonably discriminatory are: (1) That it singles out and attempts to reach and affect only those engaged in transportation of individuals for hire who solicit business upon the streets and not at all other persons so engaged in transporting individuals for hire; (2) that it requires taximeters on motor-driven vehicles designed to carry not more than four persons, and makes no such requirements as to horse-drawn vehicles or motor-driven vehicles of a greater carrying capacity than four persons; (3) that it fixes lower rates of fare for motor-driven vehicles than for horse-drawn vehicles for the same distance; (4) that it requires a fixed payment—$5 license fee for a cab and $10 license fee for coaches and a $10 license fee for sight-seeing cars or those that carry more than seven persons.

[15] In so far as the first objection is concerned, it is a natural and just classification between those who solicit business upon the public streets and other persons who are engaged in the transportation of passengers for hire. The hackmen who ply the streets for hire are because of that fact engaged in a public employment which naturally and necessarily differentiates their position from that of private livery men. In Prof. Wyman's work on Public Service Corporations (volume 1, § 107), it is said:

"The hackmen who ply for hire have always been regarded as in the employment of the public. Theirs is really one of the most striking cases of temporary monopoly. In the case of any hackman his rival may be around the corner prepared to make a fair price; and yet as the traveler cannot bide his time he will often submit to an extortionate price rather than let a moment pass. For the time being the monopoly is effective, and therefore the necessity of regulating the business of hackmen upon the principles of public service law has long been apparent."

[16] The classification which the ordinance makes between those operating motor-driven vehicles and horse-drawn vehicles which is objected to in the second objection, set forth above, is one which has repeatedly had the sanction of the courts. People v. MacWilliams, 91 App. Div. 176, 86 N. Y. Supp. 357; Christy v. Elliott, 216 Ill. 31, 74 N. E. 1035, 1 L. R. A. (N. S.) 215, 108 Am. St. Rep. 196, 3 Ann. Cas. 487; State v. Swagerty, 203 Mo. 517, 102 S. W. 483, 10 L. R. A. (N. S.) 601, 120 Am. St. Rep. 671, 11 Ann. Cas. 725. The purpose of a taximeter is to enable the occupant of the cab to determine the distance traveled and the rates of fare therefor. It is a matter of common knowledge that the distance traveled is more easily ascertainable in the case of horse-drawn than in the case of motor-driven vehicles.

[17] The fact that motor-driven vehicles designed to carry not more than four persons are required to have taximeters, while the same requirement is not made as to motor-driven vehicles of greater carrying capacity, cannot be said to be unreasonably discriminatory. The smaller cabs designed to carry a few persons are more generally engaged in transient business, while touring cars and sight-seeing vehicles designed to carry a larger number of persons are more generally employed to travel a fixed route between known points or are employed for a definite time at an agreed rate.

[18] In determining whether or not a provision of an ordinance is discriminatory, it is always to be borne in mind that regulations which are designed to promote public convenience are not to be condemned, and whether or not such regulations are adapted to this end rests largely within the discretion of the governing body of the city. City of Buffalo v. N. Y., L. E. & W. R. R., 152 N. Y. 276, 281, 46 N. E. 496.

[19] The objection that the ordinance fixes lower rates of fare for motor-driven vehicles than for horse-drawn vehicles the court cannot determine from the proof presented to be unreasonably discriminatory. It may be that there are those among the public who prefer the horse-drawn to the motor-driven vehicle and that if a lower rate than that prescribed for motor-driven vehicles were adopted the horse-drawn vehicle would cease to exist. If this be so, then the difference in rate would be justified, not on the ground that it gives the owner of the horse-drawn vehicles an advantage over his better equipped competitor, but on the ground that it was essential in order to have horse-drawn hacks operated at all, and thus make it possible to satisfy the demand of those who may prefer horse-drawn to motor-driven vehicles. Those engaged in operating horse-drawn vehicles are engaged in a different kind of public service from those engaged in operating motor-driven vehicles. The character of service being different, the provisions of the ordinance which place them in a different class are not on that account unreasonably discriminatory.

[20] The fourth objection urged relates to what is obviously a mere classification between vehicles of different character and in no way discriminates against any person.

There is not therefore anything in the provisions objected to that denies to any person or class of persons the equal protection of the laws. The distinctions made in the ordinance are not made arbitrarily, but are generally speaking a classification made with due regard to the acts sought to be regulated and bear a natural and reasonable relation to the objects classified. Such being the case it follows that the ordinance is not unreasonably discriminatory.

Finally, it remains only to consider the contentions of the plaintiffs that the ordinance is unreasonable and unjust and therefore void. The plaintiffs claim that it is unjust and unreasonable in the following respects:

First, it requires expensive meters; second, it imposes unreasonable penalties for incorrect meters; third, the requirements exacted of an applicant for a driver's license are unreasonable; fourth, that the provisions for the suspension and revocation of a driver's license are unreasonable; fifth, that the requirement that no person shall solicit passengers for a public hack or hacks upon the streets or highways of the city, except the driver of a public hack when sitting upon the box of his vehicle, is unreasonable; sixth, the prohibition against any one riding on the seat with the driver is unreasonable; seventh, that the rates, prescribed are so low as to make it impossible to operate motor vehicles at a profit, and that therefore the ordinance is unreasonable.

[21] 1. The requirement that meters shall be used has been shown by experience to be essential in order to check the frauds which might easily be perpetrated upon passengers. The commissioner of accounts of the city of New York and the commission appointed by the mayor of the city to investigate this whole subject of taxicab regulation have both reported that such frauds have been commonly committed. The requirement that meters shall be used is not only necessary if the frauds heretofore practiced are to be prevented, but is obviously so just and reasonable a regulation as not to justify further discussion.

[22] 2. If the requirement that meters shall be used is reasonable it follows as a corollary that the ordinance may impose penalties for the failure to comply with this requirement. The requirement of the ordinance is that correct meters shall be used. Meters of any other character would only serve to facilitate the perpetration of fraud. The penalties prescribed for a violation of the ordinance are reasonable and are such as have been commonly prescribed in similar cases by other municipalities.

[23] 3. The requirement that an applicant for a driver's license shall present a sworn testimonial as to his character by two reputable citizens and a further testimonial from his last employer, unless a sufficient reason is given for its omission, is a reasonable and wise requirement designed to afford protection to those who in using such vehicles are obliged to commit the safety of their persons and property to the care of such persons. In the opinion of the board of aldermen this requirement was deemed essential to securing competent and reliable men to operate such vehicles. The plaintiffs object to the ordinance on the ground that the abolition of private hack stands deprives them of the opportunity to protect their patrons, because they will no longer have any control or authority over those operating motor vehicles. This objection would not be without force if it were not for the requirement that the bureau of licenses should exercise care in the selection of such drivers and retain a measure of control over them after their appointment. Notwithstanding the fact that this provision is well calculated to protect the patrons and the guests of the plaintiffs and others, it is objected to by the plaintiffs on the ground that it will prohibit "many thoroughly competent and reliable men from pursuing this calling." In a careful report submitted to the mayor by the commission appointed to investigate the subject of the regulation and control of public hacks and hack stands, the commission in suggesting a proposed ordinance which has since been enacted into law, and which is the ordinance now under review, say:

"Proprietors of some of the large hotels object to the elimination of private stands, insisting that if this be done they cannot insure to their guests the safe and efficient service they have now. They fear that unaccompanied women using public hacks will not be so well protected and that the lost articles will not be so well handled. Their objections would be well founded if it were proposed merely to abolish the private stands without providing for much more thorough regulation than we have at present. We fully appreciate the fact that if the private stands be abolished the city must assume a much heavier burden of regulation, inspection and oversight of the general hack service than is imposed upon it at present. In other words, it will be necessary that the city administration shall so control and regulate

public hackmen that the proposed public hack service shall be at least equal in efficiency to the present private service. Such control is essential to the success of the change we recommend. It is therefore necessary, in considering the proposed ordinance which we submit, to read it at all times in connection with our views herein set forth."

4. The provisions of the ordinance giving to the mayor the power to suspend or revoke a driver's license is only a reasonable method of securing such continued control over such drivers as is essential to the protection of those using such vehicles.

[24] 5. The requirement that no person shall solicit passengers for a public hack upon the streets except the driver when sitting upon the box of his vehicle is obviously designed to prevent the annoyance of those near such hack stands and to prevent the drivers of such hacks from congregating upon the sidewalk in front of hotels and other public buildings, and by their solicitations obstructing traffic and making a nuisance of themselves to the patrons and guests of such hotels and to others going to and from such public buildings.

This requirement is in all respects reasonable and just, and is well adapted to secure the accomplishment of the purpose which the framers of the ordinance had in mind.

[25] 6. The prohibition against allowing any one to ride on the seat with the driver is a reasonable police regulation and will tend to promote the safety of those using such hacks. The argument that this provision confiscates physically a fractional part of the usable value of the cab loses sight of the reason which impelled the adoption of the provision. The reasons leading to the adoption of this prohibition are well set forth in the report made to the mayor by the commissioner of accounts in January, 1912, which has already been referred to. In that report it is said:

"Finally we would suggest that no license be granted by the bureau of licences to any cab or taxicab which is constructed with a seat beside the driver. The reason for this provision is obvious. Police records in all cities give evidence of robberies and assaults committed by hackmen with the assistance of companions. Section 324 of the ordinances provides that 'no licensed hackman shall carry any other person than the person first employing the hack without the consent of such passenger.' This section, however, is inadequate. There would appear to be no violation of the provision unless the passenger actually protests. At any rate, the passenger's acquiescence is quite sufficient. Most travelers in New York would, if requested by the driver, readily consent to his carrying an additional passenger so long as the latter was not to occupy a seat inside the vehicle. In a lonely spot the passenger inside would be quite helpless against two men. This practice, which is not uncommon, may be reduced to a minimum, we believe, by eliminating the possibility of any person sitting beside the driver of a cab or taxicab."

I have thus set forth at length the reasons which impelled the adoption of this provision because a mere statement of them shows that the requirement was adopted not arbitrarily, but as a necessary police regulation to secure the safety of passengers.

[26] 7. The contention that the rates prescribed are so low as to make it impossible to operate motor vehicles at a profit and are therefore unjust and unreasonable is urged in the briefs of the coun-

sel for the plaintiffs, under the contention that the rates prescribed are confiscatory. ' It has already been pointed out that this contention is founded upon a false assumption that those operating hacks under the former ordinances did so under a contract with the city and without regard to the fundamental distinction asserted at common law and recognized in our constitutional provisions between those engaged in conducting a private business and those the nature of whose business subjects their occupation to public regulation. This. contention fell with the false assumption upon which it was founded when it appeared that the permits issued were not contracts conferring property rights, but revocable licenses, and that the rates of fare which the city attempted to prescribe related only to the business of hackmen who from time immemorial have been the subject of public regulation. If, however, the rates prescribed were in fact so low as to make it impossible to operate motor vehicles under them at a profit, that fact would tend to establish that the ordinance itself was unjust and unreasonable. The ordinance prescribes the following rates: For not more than two passengers for the first half mile or any portion thereof, 30 cents, and for each succeeding one-quarter mile or any portion thereof, 10 cents. For three or more passengers for the first half mile or any portion thereof, 40 cents, and for each succeeding one-sixth mile or any portion thereof, 10 cents. The affidavits submitted upon these motions fall far short of satisfying the court that the rates of fare prescribed are unjust and unreasonable. On behalf of the defendants evidence is adduced to show that such motor-driven vehicles can be operated at a profit upon the rates prescribed. Upon this question the motions present a sharp conflict of fact which should not be determined upon affidavits upon a preliminary hearing in advance of trial. When it is realized that the rates heretofore prevailing were necessarily so high as not only to pay a fair profit to those rendering service, but also to defray the large sums which these persons were accustomed to pay to those operating hotels in front of whose premises private hack stands were established, it is easy to understand that the rates heretofore prevailing represented a profit upon something other than the cost of rendering the service.

[27] Indeed, the plaintiffs contend that the rates of fare prescribed are confiscatory and unreasonable, not because they will not permit those rendering such services to receive a fair profit for the service rendered, but because they would fail to yield a fair return upon all the property employed by the corporation rendering the service. In short, the contention is that the rule declared by the United States Supreme Court for determining the reasonableness of rates in cases of a railroad corporation operating under a franchise are applicable to hackmen operating under a revocable license. The claim is too unreasonable, too clearly contrary to the fundamental principles which have been discussed above, to be entitled to further comment.

The contention advanced by the plaintiffs that the ordinance requires the driver to have been a resident of the city for at least a year and that it therefore violates article 4, § 2, of the federal Constitution, which provides that "the citizens of each state shall be entitled to all

privileges and immunities of citizens in the several states," is completely answered by pointing out that the ordinance does not contain such a requirement or prescribe conditions from which it can reasonably be inferred that such a requirement exists. The examination made of the objections urged to the ordinance shows that these objections are without merit and that the ordinance itself, in so far as its provisions are involved upon these motions, in no way offends against any constitutional or statutory provision or against any canon by which the validity of a municipal ordinance may justly be tested.

The ordinance was not hastily adopted. Careful and thorough examination and investigation of the whole subject-matter involved preceded the framing and adoption of the ordinance. Upon the whole the ordinance must be pronounced a serious and well-considered attempt to remedy abuses which have grown to such an extent as to make the application of a remedy imperative.

The motions are denied, with costs, and the temporary injunctions heretofore granted are vacated and set aside.