(59 App. Div. 4.)

## CITY OF NEW YORK v. HEXAMER.

(Supreme Court, Appellate Division, Second Department. March 8, 1901.)

1. MUNICIPAL CORPORATIONS—POLICE POWER—LICENSING HACKMEN— PUBLIC HACKMEN.

Ordinance N. Y. May 26, 1899, §§ 1, 2, requiring all public hackmen, cabmen, etc., to be licensed, and providing a penalty for the failure thereof,. does not require the licensing of the drivers of carriages belonging to a liveryman in New Jersey, who has charge of the carriage service of an international steamship company landing in Brooklyn at intervals, and whose drivers do not take up any passengers except at the private pier of the company.

2. SAME.

Greater N. Y. Charter, § 49, authorizing the city to license public cabmen and carriage drivers, does not authorize the city to provide for the licensing of drivers of carriages belonging to a New Jersey liveryman, who has charge of the carriage service of an international steamship company landing in Brooklyn, and whose drivers do not take up passengers except at the private piers of the company.

Agreed case by the city of New York against Alexander P. Hexamer to enforce a penalty for the violation of an ordinance creating a license on carriage drivers. Action dismissed.

Argued before GOODRICH, P. J., and WOODWARD, HIRSCHBERG, JENKS, and SEWELL, JJ.

William J. Carr (Peter P. Smith, on the brief), for plaintiff.
Joseph Larocque, Jr. (Nelson Shipman, on the brief), for defendant.

WOODWARD, J. Section 49 of the Greater New York Charter provides as follows:

"Sec. 49. Subject to the provisions of this act, the municipal assembly shall have power within said city to make, establish, publish and modify, amend or repeal ordinances, rules, regulations and by-laws not inconsistent with this act, or with the constitution or the laws of the United States, or of this state, for the following purposes: * * * 20. In relation to the licensing and business of public cartmen, truckmen, packmen, cabmen, expressmen, cardrivers and boatmen, pawn-brokers, junk dealers, keepers of intelligence offices, dealers in second-hand articles, hawkers, peddlers, vendors and the keeping of dogs, menageries, circuses, common shows and scalpers in coal freights, bone boiling, fat rendering and other noxious businesses, and to fixing the license, if any, therefor. * * * 27. To regulate the rates of fare to be taken by owners or drivers of hackney coaches or carriages; such owners shall pay an annual license fee to be determined by the municipal assembly."

Section 50 of the Greater New York charter provides that, subject to the limitations above suggested, the municipal assembly "may from time to time ordain and pass all such ordinances, rules, regulations and by-laws as to the said municipal assembly may seem meet for the good rule and government of the city, and to carry out the purposes and provisions of this act or of other laws relating to the said city, and may provide for the enforcement of the same by such fines, penalties, forfeitures and imprisonment as may by ordinance or by-law be prescribed." Under the authority of these provisions of the charter the municipal assembly duly enacted the following sections of a general ordinance in relation to business requiring a license:

"Section 1. The following businesses must be duly licensed as herein provided, namely, public cartmen, truckmen, hackmen, cabmen, expressmen, drivers, junk dealers, dealers in secondhand articles, hawkers, peddlers, vendors, ticket speculators, coal scalpers, common shows, shooting galleries, bowling alleys, billiard tables, dirt carts, exterior hoists, and stands within stoop-lines, and under the stairs of the elevated railroad stations.

"Sec. 2. No person shall engage in or carry on any such business without a license therefor under a penalty of not less than $2, nor more than $25 for each offense, and for the purposes of this ordinance the term 'person' shall include any human being or lawful association of such."

The controversy involves the questions whether the defendant is a public hackman, within the meaning of section 1 of the above ordinance, and therefore liable to the penalty provided by section 2, and whether sections 1 and 2 are valid. The agreed facts, aside from the formal matters as to the corporate capacity of the plaintiff, the passage of the ordinance, etc., are as follows: The defendant is, and at the times hereinafter mentioned was, the owner and keeper of a livery stable at the city of Hoboken, in the state of New Jersey, and for a number of years had had charge of the carriage service of the North German Lloyd Steamship Company at its piers in that city. After the great fire which destroyed the piers on the 30th day of June, 1900, the steamship company leased from the receiver of the Brooklyn Wharf & Warehouse Company the latter's piers, Nos. 24 and 26, East river, lying between the foot of Amity street and the foot of Warren street, in the borough of Brooklyn, with the right to use the same in common with said warehouse company, and the latter's bulkhead, which connects the said piers, and abuts upon the latter's stores; and since that time the steamship company has been in possession of these premises under its lease, docking certain of its steamships at said piers, and landing its passengers thereon. On the 6th day of August the defendant was instructed to take charge of the steamship company's carriage service at the piers in Brooklyn; and pursuant to these instructions, and on the 24th day of August, he sent a number of carriages from his stables in the city of Hoboken to said pier No. 26, in the borough of Brooklyn, to meet the steamship Friederich der Grosse, which was about to arrive. The drivers, acting under instructions, drove upon the pier and bulkhead, and awaited the orders of defendant's manager, Henry Ortlieb, whose duty it was to meet the passengers from the steamship, and to furnish them with such conveyances as they might then and there hire. On the particular occasion under consideration the defendant's manager did let a carriage to one of the passengers coming from the steamship, and such passenger was carried through the streets of Brooklyn to his destination, when the carriage was driven directly to defendant's stable in Hoboken. It is conceded that the drivers of all the defendant's carriages employed for the purpose of meeting the vessels of the steamship company are under instructions to return directly to the defendant's stables after conveying their passengers to their destinations, or after being dismissed by defendant's manager, and not to pick up any passengers either in going to or coming from said pier; and that these instructions were in all cases obeyed. The question is whether, under the circumstances, the defendant is a public hackman, within

the meaning of the ordinance, and whether he is liable to the penalty prescribed, it being agreed that for the purposes of this controversy the penalty shall be fixed at two dollars.

The record does not disclose the amount of the license fee required by the ordinance, but, as subdivision 27 of section 49 of the Greater New York charter provides that "such owners shall pay an annual license fee, to be determined by the municipal assembly," we may assume that a license fee was prescribed. In view of the provisions of section 13 of the ordinance, which requires that "the owners of hacks specially licensed shall, in addition to the lawful fees hereinbefore provided, pay annually an additional fee of $25 for each hack allowed any stand," we may conclude that the fee is sufficiently large to constitute a tax, independently of the cost of issuing and recording the license, or of any special police control over the matter regulated. People v. Jarvis, 19 App. Div. 466, 467, 46 N. Y. Supp. 596. Cooley, Tax'n (2d Ed.) p. 597, c. 19, says that "it would seem that, when a power to license is given, the intendment must be that regulation is the object, unless there is something in the language of the grant, or in the circumstances under which it is made, indicating with sufficient certainty that the raising of revenue by means thereof was contemplated." People v. Jarvis, 19 App. Div. 469, 46 N. Y. Supp. 598, 599, and authorities there cited. Without going into the question whether the city of New York could compel the defendant to submit to the special license, which has every appearance of a revenue measure, we will confine the discussion to the issues presented, and we are of opinion that the defendant is entitled to judgment dismissing the complaint. There is no provision in the statute or in the ordinance, so far as our attention is called to it, for the licensing of livery stables. The defendant is conceded to be engaged in conducting a livery stable. He is not within the jurisdiction of the city of New York, nor yet of this state; and yet, if this penalty may be collected, it is equivalent to saying that a municipal ordinance of the city of New York may have an extraterritorial effect, and may impose a tax upon this citizen of New Jersey because of the fact that as an incident to his business he sends at intervals carriages into the city of New York, and upon private premises, for the purpose of affording a responsible carriage service to the passengers of an international transportation company. The service is such as to require a large number of carriages at a given time. It imposes no special burden upon the streets of the city, does not interfere with the normal hackney coach service at the public stands, and the defendant himself, through a responsible manager, is on hand to afford the regulation necessary upon the premises of the steamship company, so that this incidental use of the defendant's carriages at intervals to take care of the passengers of the steamship company is not within the reason of the law which sanctions licenses for hacks and other public conveyances, which, from necessity, are obliged to occupy space in public highways or places, and which require police regulation in order to preserve the peace and insure efficiency of service. In the case of Com. v. Stodder, 2 Cush. 562,—the authority of which has never been questioned

in Massachusetts,—the court had under consideration an ordinance which exacted various fees, ranging from $1 to $25, for setting up, using, or driving in the city of Boston "any hackney carriage for the conveyance of persons for hire without a license from the mayor and aldermen, under a penalty of not less than five nor more than twenty dollars every time such carriage is used." A citizen of Roxbury set up a line of stage coaches running between that place and the city of Boston, the ordinances of which prescribed the stand for such line, and an action was brought in behalf of the commonwealth to collect the penalties for a disregard of the ordinance which required the owner to take out a license. Commenting upon this branch of the case, the court say:

"As to the requisition of a payment of money, operating as it does as a direct tax upon the vehicle to be used, we can find no authority for this provision of the ordinance. Taxes are to be levied under the provisions of general laws enacted by the legislature. We look in vain for authority for it either in the city charter or the statutes of the commonwealth. The act of 1847 (chapter 224), under and by virtue of which this ordinance of July 12, 1847, was professedly adopted, merely authorized the mayor and aldermen to adopt rules and orders 'for the due regulation in such city of omnibuses, stages,' etc. The power here conferred was not a tax-levying power. The title of the act was 'An act to prevent obstruction in the streets of cities and to regulate hackney coaches and other vehicles.' All the apparent objects of the act may be secured by due regulations as to the time, place, and mode of using such vehicles, irrespective of any payment of a specific duty or tax upon them, as provided in the ordinance. As a tax, it would operate unjustly also, as requiring to be paid to the city of Boston a specific duty or tax upon a vehicle owned and used by an inhabitant of another town or city, in which alone he should be taxed for his personal property."

The court admitted that, if the license fee had been merely nominal, or sufficient only to meet the expense of issuing the same, it might not be objectionable, but held that:

"In no aspect in which we have been able to regard this part of the ordinance can we view it in any other light than as an assessment of a tax upon the owners of these vehicles. As such the court are of opinion it was without legal authority, and. as the obtaining of a license in all cases requires this payment, the ordinance, so far as it ordains that no person shall set up, use, or drive in the city of Boston any omnibus without a license from the mayor and aldermen, under a penalty of not less than five nor more than twenty dollars every time such carriage is used, is illegal, and cannot be enforced."

It is true, of course, that in the matter now before us the legislature has authorized the municipal assembly to determine the annual license fee to be paid by the owners of these carriages used for hire, but it may be questioned if this is to be understood to have been a taxing power beyond the cost of regulating, for it is a fundamental and well-settled principle of law that when a municipal corporation is given the power to license useful trades or occupations it cannot use the license tax to raise revenue, nor is it authorized to entirely prohibit the exercise of the trade or occupation by any excessive license fee. People v. Jarvis, 19 App. Div. 469, 46 N. Y. Supp. 598, 599, and authorities cited; People v. Marx, 99 N. Y. 377, 386, 2 N. E. 29. While it may be conceded that the license fee imposed by the ordinance in question is a proper one in so far as it relates to carriages daily employed as public hacks which occupy the

stands provided, and are subject to police regulations, we are of opinion that the statute does not authorize the municipal assembly to impose an annual license fee upon the carriages of this defendant in the state of New Jersey, because such carriages may, as an incident to the conducting of a livery stable in a neighboring state, be occasionally sent into the city of New York to perform a specific service which does not involve any of the evils which the ordinance is intended to minimize. The ordinance, in its operation, should be confined to those cases where it is plainly discoverable that the mischief exists for which it was intended to provide a remedy, and where the need is evidenced for the extension of the protection intended by the legislature. Village of Stamford v. Fisher, 140 N. Y. 187, 191, 35 N. E. 500. Considerations of interstate comity, in the absence of positive law, ought to restrain us from enacting regulations which cannot fail to work unjustly and inequitably. It would be most inhospitable for the state of New York to practically close its streets to the public carriages of a neighboring state under the circumstances disclosed by the agreed statement of facts, and would justify retaliatory measures on the part of New Jersey, which might, in the long run, do much more damage to the hackmen of New York than might be reasonably anticipated from the incidental employment of defendant's carriages in the service of the patrons of the steamship company. The provision of the statute is that "the municipal assembly shall have power within said city" to make ordinances, etc. We are of opinion that all of the beneficial purposes of the ordinance in question may be served by applying it to the carriages regularly employed within the city, or such as come within the reason of the law, without attempting to exact a tax from citizens of the state of New Jersey. We would not expect the city of Hoboken, or Jersey City, to enact ordinances, and to enforce them in such a manner as to practically exclude New York hackmen from incidental visits in conveying passengers to their destinations; and we ought not to give such construction to the ordinance now under consideration, unless we expect to encourage retaliation. In City of Oswego v. Collins, 38 Hun, 171, it was held that an omnibus employed in carrying patrons of a hotel to and from trains without compensation for such carriage was not a public conveyance, and it might be that these carriages, confined merely to the taking care of the passengers of an international transportation company, would be considered in the same light if it was necessary to the conclusion; but we prefer to rest the matter upon the proposition that the incidental use of the carriages of a livery stable in a neighboring state within the city of New York, under the facts as they are conceded to exist, is not within the spirit of the statute or the ordinance, because it could not have been contemplated by the legislature that it was giving the power to levy a direct tax upon the property of an adjacent state, and because the service rendered does not require any of the privileges secured to regular hackney carriages, imposes no unusual burdens upon the thoroughfares of the city, and involves no additional expense of police regulation.

This conclusion makes it unnecessary to determine the mooted

question whether the imposing of a penalty of not less than $2 or more than $25 for the violation of this ordinance is within the requirements of the law. Cooley, Const. Lim. (6th Ed.) 243, says that:

"A by-law, to be reasonable, should be certain. If it affixes a penalty for its violation, it would seem that such penalty should be a fixed and certain sum, and not left to the discretion of the officer or court which is to impose it on conviction; though a by-law imposing a penalty not exceeding a certain sum has been held not to be void for uncertainty."

The authorities cited in support of both of these propositions are outside this jurisdiction, but in McNall v. Kales, 61 Hun, 231, 16 N. Y. Supp. 7, it was held that a regulation that "the local board of health will enforce compliance and inflict a penalty not exceeding a hundred dollars for noncompliance with or violation of its lawful regulations" did not comply with the provisions of the statute, and was without force. The court say:

"The theory of the statute is that the board of health should fix, applicable to all persons, a definite penalty for violation of its regulations; and on proof of the violation thereof the recovery would be for the exact amount of money thus provided for, and not for a sum to be established by proof upon the trial."

In City of Poughkeepsie v. King, 38 App. Div. 610, 57 N. Y. Supp. 116, this court held that a statute which provided that the common council should "ordain fixed penalties" was not satisfied by a provision imposing a penalty of not less than $10 nor more than $25. It may be questioned whether the statute in the present instance, which authorizes the municipal assembly to "provide for the enforcement of the same by such fines, penalties, forfeitures, and imprisonment as may by ordinance or by-law be prescribed," is complied with by a provision for a discretionary penalty. To prescribe is to lay down authoritatively for direction; to give as a guide, direction, or rule of action; to impose as a peremptory order; to direct. Webst. Dict. 1030. To prescribe a penalty is to fix a penalty. This is clearly the construction put upon the word in Thompson v. Schermerhorn, 9 Barb. 152; Id., 6 N. Y. 92, and it is used in this same sense in Village of Stamford v. Fisher, supra, and in Com. v. Gage, 114 Mass. 328, 330. Without resting the determination upon this proposition, it is clear that the weight of authority is with the defendant, and that the ordinance, in so far as it relates to the penalty, is at least open to doubt as to its validity.

The defendant should have judgment dismissing the action. All concur; JENKS, J., in result.