(94 Misc. Rep. 509)

PEOPLE v. CUNEEN. SAME v. FORBES. SAME v. WOODS.

(Court of General Sessions, New York County. March, 1916.)

1. LICENSES ⊂⊃14(2)—POLICE REGULATION—"PUBLIC HACKS"—"TAXICABS."
    Under city ordinances relating to the licensing of public hacks and taxicabs, defining a "public hack" as a vehicle plying for hire, for which public patronage is solicited upon the streets, and a "taxicab" as a coach driven by mechanical power on which a taximeter is affixed, and providing that any vehicle with a taximeter affixed using the streets for carrying passengers for hire shall be deemed a public hack and must be licensed, a vehicle driven by mechanical power, having no taximeter, for which patronage is not solicited on the streets, is neither a taxicab nor a public hack.

    [Ed. Note.—For other cases, see Licenses, Cent. Dig. § 26; Dec. Dig. ⊂⊃14(2).]

2. LICENSES ⊂⊃14(2)—POLICE REGULATION—PUBLIC HACKS.
    The solicitation of the public by the driver of a vehicle driven by mechanical power having no taximeter affixed within a railway station is not solicitation on the streets, within ordinances relating to licensing of such vehicles.

    [Ed. Note.—For other cases, see Licenses, Cent. Dig. § 26; Dec. Dig. ⊂⊃14(2).]

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. LICENSES ⊚⟶14(2)—POLICE REGULATIONS—"STREET."
    In ordinances relating to the licensing of public hacks for which public patronage is solicited on the streets, and defining "street" as any street, avenue, road, every class of public road, square, and place, except a marginal wharf, the word "street" does not include a position in a railway depot.

    [Ed. Note.—For other cases, see Licenses, Cent. Dig. § 26; Dec. Dig. ⊚⟶14(2).

    For other definitions, see Words and Phrases, First and Second Series, Street.]

4. LICENSES ⊚⟶14(2)—POLICE REGULATIONS.
    The driver of a motor vehicle without a taximeter affixed, who responded to a telephone call at a private garage and received a passenger for hire, was subject to a license tax imposed by ordinances on public hacks soliciting the public patronage for hire on the streets and taxicabs with taximeters using the streets for carrying passengers for hire.

    [Ed. Note.—For other cases, see Licenses, Cent. Dig. § 26; Dec. Dig. ⊚⟶14(2).]

5. LICENSES ⊚⟶14(2)—POLICE REGULATIONS.
    A driver of a motor vehicle without a taximeter affixed, carrying a passenger for hire from a hotel, who is not shown to have solicited the patronage of his fare on the street or elsewhere, was not subject to license tax provisions of ordinances relating to hacks soliciting patronage on the streets and taxicabs with taximeter affixed.

    [Ed. Note.—For other cases, see Licenses, Cent. Dig. § 26; Dec. Dig. ⊚⟶14(2).]

Appeal from City Magistrate's Court of New York City.

Thomas J. Cuneen, John Forbes, and Francis E. Woods were respectively convicted of violating a city ordinance relating to licensing hacks, cabs, and taxicabs, and separately appeal. Reversed.

Wing & Wing, of New York City, for appellants.

Lamar Hardy, Corp. Counsel, of New York City, for the People.

WADHAMS, J. The defendant in each of the above cases has appealed from a judgment of the City Magistrate's Court convicting him of a violation of the city ordinances relating to hacks, cabs, and taxicabs. The defendants were tried separately, but all three cases involve the construction of the same sections of the Code of Ordinances. The constitutionality of the ordinances was challenged upon the trial, but their validity, having been established in recent decisions, was conceded upon these appeals. Waldorf-Astoria Hotel Company v. City of New York, 212 N. Y. 97, 105 N. E. 803; Yellow Taxicab Co. v. Gaynor and Mason-Seaman Transportation Co. v. City of New York, 82 Misc. Rep. 94, 143 N. Y. Supp. 279, affirmed 159 App. Div. 893, 144 N. Y. Supp. 299; Mason-Seaman Transportation Co. v. Mitchel, 89 Misc. Rep. 230, 153 N. Y. Supp. 461, affirmed without opinion 168 App. Div. 915, 152 N. Y. Supp. 1127.

The evidence upon all essential points is undisputed. The defendants were in each case chauffeurs employed by the Mason-Seaman Transportation Company. The appeals in the three cases raise the questions whether the driver of a vehicle not licensed and equipped in accordance with the ordinance, who solicits passengers for hire within

a railroad station, or who answers a call sent to a private garage, or who takes up a fare at a hotel in the city of New York, is guilty of a violation of the city ordinances regulating the public hack business.

Section 109, subdivision 1, of article 8, chapter 14, of the Code of Ordinances of the City of New York, provides:

"*Owners.* Any owner or driver of a vehicle not licensed and equipped in accordance with the provisions of this article, or of a vehicle the license of which has been suspended or revoked, who engages in the business of a public hack, as defined hereby, or attempts to engage in such business, or solicits for hire passengers upon the streets, shall, upon conviction before any city magistrate, be punished by a fine of not over $50, or imprisonment not exceeding 30 days, or both."

The provision with respect to the equipment of vehicles is, in part, as follows:

"Sec. 101. *Taximeters—When Required.* Every public hack driven by mechanical power, seating four passengers or less, shall have affixed thereto a taximeter of a size and design approved by the commissioner."

The records in each of the cases on appeal show that the vehicles were driven by mechanical power, had a seating capacity of four passengers, but had no taximeters affixed, and the question is therefore presented whether the drivers were engaged in the businss or under the circumstances set forth in section 109 of the Code of Ordinances.

[1] The driver of a vehicle which is not equipped with a taximeter, as prescribed, is liable to fine or imprisonment, or both, if he "engages in the business of a public hack, or attempts to engage in such business or solicits for hire passengers upon the streets."

By section 80, subdivision 1, a public hack is defined:

"*Public Hack.* A vehicle plying for hire, for which public patronage is solicited upon the streets."

It therefore appears that in each of the qualifying phrases defining "driver" in section 109 is found the element, not only of plying or soliciting for hire, but also that such soliciting is "upon the streets."

Section 80, subdivision 7, contains the further definition:

"*Taxicab.* A coach driven by mechanical power on which a taximeter is affixed.

"Any vehicle that has a taximeter affixed, and uses the streets of the city for the purpose of carrying passengers for hire, shall be deemed a public hack and must be licensed under this article."

This definition broadens the scope of the ordinance by including among the vehicles which must be deemed to be public hacks one which uses the streets of the city for the purpose of carrying passengers for hire, regardless of whether the solicitation was upon the streets or elsewhere, provided, however, that such vehicle has a taximeter affixed. As it is conceded that in the cases under consideration no taximeters were affixed to the vehicles in question, they are not taxicabs, and therefore not public hacks within the definition in this subdivision. The ordinance does not require that every coach driven by mechanical power shall have a taximeter affixed, but it does provide that, if such vehicle has a taximeter affixed, it is included within the definition of a

public hack, and therefore required to be licensed and equipped and to charge the rates provided by the ordinances. If it has not such a taximeter affixed, then it need only comply with the requirements of the ordinances when plying or soliciting for hire public patronage or passengers upon the streets. It therefore becomes necessary to determine whether there was such plying or soliciting.

1. In the case of Cuneen, the defendant, on the day in question, pursuant to instructions of a dispatcher of the Mason-Seaman Transportation Company, drove a vehicle from the company's garage to a stand at the Pennsylvania railroad station, located 100 or 150 feet from Seventh avenue, within the property of the Pennsylvania Railroad Company, where he stood for about 15 minutes, and after a starter of the Mason-Seaman Transportation Company had told the passengers and the defendant the amount of the fare, the defendant received three passengers and drove them to the Park Avenue Hotel, "a distance of three long blocks," for which he received 75 cents, whereupon he was served with a summons. It further appears that licensed cabs do not use the stand where the defendant's cab stood in the Pennsylvania station, but use another section. The defendant further testified, with respect to the method of doing business, that in the morning he left the garage, went to the station, and stood in line, and received at the station as passengers persons who came from the trains, and that after taking them to their destination he returned to the station, repeating the process from 8 a. m. to 8:30 p. m.

[2] In support of the conviction it is contended that a solicitation of business by the driver of a vehicle within a railway station is engaging in the business of a public hack or soliciting for hire upon the streets, within the prohibition of the ordinance. It is undoubtedly within the legislative power to prohibit generally a plying for hire, unless certain reasonable conditions are complied with. An examination of the ordinance fails to show such general prohibition. In the definition of a public hack the plying for hire, which is regulated, is one "for which public patronage is solicited upon the streets" and section 109, defining violations, does not broaden the regulation, for it only includes within its purview the owner and driver who engages in the business of a public hack or solicits for hire passengers upon the streets of the city of New York.

It is also contended that the place where the defendant stood was open to the public; but the public which had a right to traverse it was limited to those engaged in travel upon the trains of the railway company, who had a right to pass over the property in going to and from the trains. The company could at any time exclude vehicles from the place within its premises where the defendant stood, and he was therefore present only by their permission. Donovan v. Pennsylvania Co., 199 U. S. 279, 26 Sup. Ct. 91, 50 L. Ed. 192; New York Central & H. R. R. R. Co. v. Ryan, 71 Misc. Rep. 241, 129 N. Y. Supp. 55. The property of the railroad is not a street which is open to all who may pass. I therefore conclude that this defendant was not upon the streets, avenues, or highways at the time he solicited his fare, but was within the property of the Pennsylvania railroad station, and was not guilty of a violation of the ordinance.

An examination of the authorities fails to disclose a decision in the state of New York or in the United States construing a similar ordinance upon this precise point. The case of City of New York v. Hexamer, 59 App. Div. 4, 69 N. Y. Supp. 198, is not in point, as the court held that under the Greater New York Charter the municipal assembly had no authority to impose the ordinance there in question upon a person engaged in conducting a livery stable in the state of New Jersey, who at intervals sends his carriages into the city of New York for the sole purpose of meeting the steamers of a trans-atlantic line and conveying the passengers to their respective destinations.

The construction here placed upon the ordinance is, however, not without authority. Similar enactments regulating public hacks in the city of London have been construed by the English courts. In Case v. Storey, L. R. 4 Ex. 319, the question before the court was whether a hackney carriage, which was inside the station of the Great Northern Railway Company at King's Cross, in the parish of St. Pancras, within the metropolitan police district, by leave of the railway company for the accommodation of their passengers, was "plying for hire" in any "street or place," within the meaning of section 35 of the London Hackney Carriage Act, 1831 (St. 1 & 2 Will. IV, c. 22), and whether the driver was consequently compellable, under that section, to go with any person desirous of hiring him. It was held that section 35 should be construed with section 4 of the act, which defined "hackney carriage" to be "every carriage with two or more wheels which shall be used for the purpose of standing or plying for hire in any public street or road at any place within a distance of five miles from the general post office in the city of London," and that a railroad station, being private property, could not be called a public street or road. Kelly, C. B., at page 322, said:

"It is clear to me that railway stations are not either public streets or public roads. They are private property; and although it is true that they are places of public resort, that does not of itself make them public places. The public only resort there upon railway business, and the railway company might exclude them at any moment they liked, except when a train is actually arriving or departing. For the proper carrying on of their business they must necessarily open their premises, which are nevertheless private, and in no possible manner capable of being described as public streets or roads."

In Clarke v. Stanford, L. R. 6 Q. B. 357, the defendant was charged with unlawfully plying for hire with an unlicensed hackney carriage at the Harrow railway station of the London & North Western Railway Company, within the limits of the metropolitan police district, which were also those of the Metropolitan Public Carriage Act, 1869 (St. 32 & 33 Vict. c. 115). The act defined a hackney carriage, which was required to be licensed and to observe the regulations prescribed by the act, as "any carriage for the conveyance of passengers which plies for hire within the limits of this act, and is not a stage carriage." Cockburn, C. J., at page 359, says:

"I think this case is clearly within the statute. The owner and driver of this carriage were rightly convicted, as the carriage was plying for hire. In Case v. Storey, L. R. 4 Ex. 319, the question turned upon a different statute, and the decision was that under that statute there must be a plying for hire in a public place; this case is therefore not governed by that decision. The

words of the present statute, 'plying for hire,' are satisfied by the facts which exist in the present case. Carriages are admitted within the premises of the railway company at Harrow under a contract, by which they engage to convey any passengers who come by railway, and although it is not expressly so found in this case, yet it is clear that the appellants' carriages are exclusively for the use of passengers who come by the railway. I assume that the use of the carriage is confined to the purposes of the passengers coming by railway; still that is a plying for hire. * * * The Legislature has omitted the words 'public place,' and this appears to have been done intentionally and advisedly. I think the facts show that there was a plying for hire within the statute, and the carriage was therefore a hackney carriage within the statute."

In Allen v. Tunbridge, L. R. 6 C. P. 481, it was held, following Clarke v. Stanford, that the defendant, who solicited two persons who hired a carriage at a railway station of the Southeastern Railway Company at Cannon street, was plying for hire within section 7 of St. 32 & 33 Victoria, chapter 115. In the argument it was pointed out that the same section made a difference between the definition of a hackney carriage and the definition of a stage carriage. The definition of a stage carriage added to the words "plying for hire" the words "in any public street, road or place" and Willes, J., thereupon intimated that if the defendant's carriage was construed to be a stage carriage a different result would ensue.

[3] It is urged, however, that the word "street," as used in the ordinance, must be construed to include any place, because of the definition of the word "street" as found in article 1, section 1, subdivision 18, which is as follows:

"*Street.* Any street, avenue, road, alley, lane, highway, boulevard, concourse, driveway, culvert, sidewalk and crosswalk, every class of public road, square and place, except marginal wharf."

The word "place," in this definition, is qualified by the word "public," which limits, not only "road and square," but also "place," and in my opinion is intended to refer to the same kinds of thoroughfares as those previously denominated in the definition; it being not only the intention to include such streets as are specifically denominated as "places," as, for instance, St. Mark's Place and Waverly Place, but also any other space or opening dedicated to the public use.

In Case v. Storey, supra, Kelly, C. B., in construing the words "in any street or place," found in section 35 of St. 1 & 2 Will. IV, c. 22, in which the penalty is imposed on the driver of any numbered hackney carriage standing or plying for hire in any street or place, referring to the argument that a railway station was a "place" within the meaning of such language, said:

"Mr. Denman argued that 'place' is a large term; but we must take it as only meaning a place ejusdem generis with a street."

In Ex parte Kippins, L. R. 1 Q. B. D. 1, construing section 17 of the London Hackney Carriage Act, 1853, which provided, "Every driver of a hackney carriage who shall refuse to drive such carriage to any place within the limits of this act, not exceeding six miles, to which he shall be required to drive any person hiring or intending to hire such carriage," shall be liable to a penalty, it was held that the

interior of a railway station, although the private property of the railway company, is a "place" within the meaning of the section. The defendant, the driver of a hackney carriage, who was engaged by a lady to drive her to the Euston Station, drove to the gates of the station, and, when requested to drive inside, although one of the railroad company's servants had told him that he was at liberty to do so, refused to enter, and upon information being laid against him it was contended that, as the interior of the station was private property, it was not a place to which he could be required to drive, within the meaning of the act. The High Court of Justice refused a motion for a rule, and Grantham, J., after citing with approval Case v. Storey and Clarke v. Stanford, said with respect to the latter:

"In that case it was held that a carriage waiting in a railway station for the conveyance of passengers arriving by train 'plies for hire,' within the meaning of section 4 of the Metropolitan Public Carriage Act of 1869 (St. 32 & 33 Vict. 3, c. 113), and that it requires a license under that act, because, as 'the plying for hire' need not be in any public place, so 'where a person has a carriage ready for the conveyance of passengers in a place frequented by the public he is plying for hire, although the place is private property.' So here I have no doubt that a driver who refuses to drive 'to any place within the limits of the act,' although it be private property, commits an offense against section 17 of the act of 1853, for there is no reference in the context in the act to the word 'public' or suggestion that the place to which the driver must drive is limited to a public place."

The English authorities cited clearly show a distinction between a plying for hire generally or in any place as distinguished from a solicitation upon the streets or public places of the city, and inasmuch as the ordinance under construction limited the prohibited acts to solicitation "upon the streets" the license in question was not required by the defendant as a prerequisite to solicit business on the private property of the Pennsylvania Railroad.

[4] 2. In the case of Forbes, the defendant had not solicited patronage, but had responded to a telephone call sent at the request of a lady residing in an apartment house, No. 128 East Thirty-Fourth street, by the hall boy, and received by the starter of the Mason-Seaman Transportation Company at their subgarage, the private property of the company, on Thirty-Second street. Under the instructions of the starter, the defendant went to the address and received a passenger, whose name had been given him by the starter, and who had been waiting for him, and took her to a department store, where he waited about eight minutes for her, and then drove her to the Grand Central station, where, after collecting $1, he was served with a summons. He then returned to the Thirty-Second street garage and waited for another call, and, being called, made several trips on the same day from the garage under similar circumstances.

In the case of Haverty's Taxicabs, Inc., v. Mitchel, 159 N. Y. Supp. 965, the Supreme Court in the Second Department granted an injunction pendente lite restraining the enforcement of the public hack ordinance approved January 2, 1915, in so far as such enforcement attempted to interfere with the operation of taxicabs which had no meters affixed and which were sent upon call from private garages. Mr. Justice Callaghan said:

"The ordinance being constitutional, the enforcement of it will not be enjoined in so far as it applies to motor vehicles soliciting patronage upon the street, or which are operated from a private garage and having meters attached. But it seems to me that no construction can be put upon this amendment that will justify interference with unlicensed motor vehicles which are called from private garages and which do not have meters attached. * * * This ordinance is highly penal and must be strictly construed. Burks v. Bosso, 180 N. Y. 341 [73 N. E. 58, 105 Am. St. Rep. 762]. Tested by this rule, it seems that, in order that a vehicle should come within the purview of the provisions of the ordinance, it must have a meter attached, or it must solicit patronage upon the street. I cannot see how those operating from a private garage on call without a meter can possibly be considered as being one of those defined by the ordinance."

In support of the judgment in this case, Mason-Seaman Transportation Co. v. Mitchell, 89 Misc. Rep. 230, 153 N. Y. Supp. 461, affirmed without opinion 168 App. Div. 915, 152 N. Y. Supp. 1127, decided by the Supreme Court in the First Department, is cited as being at variance with the decision in the Second Department. In the First Department an application for an injunction pendente lite to restrain the defendant from enforcing against it the provisions of the same public hack ordinance was denied; Mr. Justice Cohalan saying:

"The amendment of which the plaintiff complains reads: 'Any vehicle that has a taximeter affixed and uses the streets and avenues of the city of New York for the purpose of carrying passengers for hire shall be deemed a public hack and licensed under this ordinance.' This ordinance was so drawn as to provide that all cabs, whether they be employed in public or private business, should come within the provisions of the public hack ordinance."

I am of the opinion that the words "all cabs" were intended to refer to cabs having meters affixed. This seems apparent from the further statement of Mr. Justice Cohalan in which it is obvious that he was limiting his decision to cabs having taximeters:

"It is asserted on behalf of the city that this legislation may be upheld as a valid exercise of the police power; that it applies alike to all vehicles which have taximeters affixed, and which use the streets of the city for the purpose of carrying passengers for hire; that, in fact, it is an altogether reasonable provision for the regulation of cabs upon the streets, so as to include with impunity all classes of vehicles, whether or not hired from private or public concerns, and which use the streets of the city for the transportation of passengers for hire."

Inasmuch as the decision refers only to cabs having taximeters affixed, it is not in conflict with Haverty's Taxicabs, Inc., v. Mitchel, supra, which in fact considered and distinguished the case; Mr. Justice Callaghan saying:

"A careful reading of the papers on appeal in that case and of the opinion convinces me that the specific question as to whether or not vehicles operated from private garages without meters should be restrained was not squarely before the court at that time, and the opinion would indicate that there was no intention of the court to pass upon that question."

Prior to the amendment of January 2, 1915, even taxicabs having meters attached which were operated from private garages were exempted from the operation of the ordinance, and by the amendment this exemption was removed. This amendment, therefore, extended the operation of the ordinance to all cabs having taximeters affixed and which used the streets, but did not extend the operation of the

ordinance to taxicabs which had no taximeters affixed and which did not solicit patronage upon the streets, but which were engaged at private garages, where they were sought by customers who desired to make personal selection by seeking the service of those maintaining private garages. The distinction between a public and private service of this character was recognized in the leading case which established the constitutionality of the ordinance (Yellow Taxicab Co. v. Gaynor, 82 Misc. Rep. 94, 143 N. Y. Supp. 279, affirmed on opinion below 159 App. Div. 893, 144 N. Y. Supp. 299), in which Mr. Justice Seabury said:

"The respects in which it is claimed that the ordinance is unreasonably discriminatory are: First, that it singles out and attempts to reach and affect only those engaged in transportation of individuals for hire who solicit business upon the streets, and not at all other persons so engaged in transporting individuals for hire. * * * In so far as the first objection is concerned, it is a natural and just classification between those who solicit business upon the public streets and other persons who are engaged in the transportation of passengers for hire. The hackmen who ply the streets for hire are because of that fact engaged in a public employment, which naturally and necessarily differentiates their position from that of private liverymen."

A similar view was held by Cockburn, C. J., in Clarke v. Stanford, supra, who, in answer to the suggestion of counsel, if the carriage was in the private yard of a hotel keeper, or waiting on the premises of a gentleman, it could not be said to be plying for hire, said:

"The case put by Mr. Bosanquet of a carriage being on a man's own premises, ready to go out if required, is not what can be understood as 'plying for hire' within the meaning of this act."

In Skinner v. Usher, L. R. 7 Q. B. 423, the defendant kept his hackney carriage upon a vacant piece of uninclosed ground which was open to the street and frequented by the public, but which was private property, and not subject to any right of passage by them. He was hailed by a person, drove his carriage across the street, and took up the person so hailing him, drove away, and after an interval of about 20 minutes returned and remained upon the piece of uninclosed ground ready for the conveyance of passengers as before. The defendant was charged with a violation of section 33 of St. 6 & 7 Vic., c. 86, which imposed a penalty upon every driver of a hackney carriage who was "plying for hire elsewhere than at some standing or place appointed for the purpose." The court construed the section in conjunction with 1 & 2 Will. IV, c. 22, as defining a public hack to be one plying for hire in any public street or road at any place within the limits of the city of London. At page 428, Blackburn, J., said:

"The appellant, therefore, who was not plying for hire in a public street or road, was not plying 'elsewhere' than at an appointed standing, within the clause."

[5] 3. In the case of Woods, the defendant on the day in question drove into the Grand Central Station, where a passenger alighted. The defendant asked for 50 cents, which the passenger handed the defendant, and went into the station. The defendant was then served with a summons. There was no evidence as to whether the defendant had solicited the patronage of his fare upon the street or else-

where. The defendant stated to the officer that he came from the Hotel Astor. The record does not disclose the manner in which the cab was engaged or where it was engaged, and, in fact, there is nothing in the record to indicate whether this cab was a private or a public hack. The record, therefore, fails to establish the commission of the offense charged.

Upon the argument, however, it was stated by counsel on both sides that it was intended to be a test case for the purpose of obtaining a construction of the law with respect to the hiring of cabs at hotels. The taking of a cab from a hotel is not different in principle from the taking of a cab from an apartment house, restaurant, theater, or private residence. If the fare is solicited upon the street, the driver of the cab must comply with the ordinance. If the cab has a taximeter affixed, it must comply with the ordinance. If a cab is called to a hotel at the request of the fare from a private livery or garage, and has no meter affixed, then it is not within the purview of the ordinance.

A similar question was before this court in the case of People v. Milne, 86 Misc. Rep. 417, 149 N. Y. Supp. 283. In that case, the defendant was driving a taxicab belonging to the Yellow Taxicab Company, which had a starter on Broadway in front of the entrance to Churchill's restaurant. The defendant was seen standing in front of the restaurant for about seven minutes and when approached by one whom he recognized to be an officer drove away, subsequently taking up the position in which the complainant had first seen him and was thereupon arrested and charged with a violation of article 3, section 1, of the public hack ordinance of the city of New York, adopted May 27, 1913, approved June 2, 1913, which provides that no public hack shall ply for hire upon the streets of the city of New York without first obtaining a license from the bureau of licenses. The defendant's vehicle had a taximeter affixed and was equipped with a movable flag or device which, when up, displayed the word "vacant." The court held that the placing of such a cab on a public street where it is accessible to those who may wish to hire it and the solicitation of passengers for hire by word, act, or exhibition of appropriate signs or devices was a plying for hire within the ordinance. Judge Crain said:

"Being actually hired is not the test of whether or not there is a plying for hire. One may ply for hire without being hired."

And further:

"A taxicab, not a public hack, can doubtless lawfully be called for an ascertained patron or hirer to a given place and may proceed to such place and stop there, although such place be a public hack stand, and remain there subject to the orders of such person so engaging it, provided that no unreasonable use be made by such taxicab of such public stand and provided that such taxicab is not subject to hire by any person other than such ascertained person or hirer from the time that it is called until the time when it returns to the garage in which it is kept; and for the purpose of securing customers taxicab companies may, by agreement, keep representatives in hotels, public restaurants and other places, but such representatives cannot be permitted to evade the ordinance in question by summoning taxicabs, not public hacks, from such garages to such places ostensibly for ascertained patrons or hirers, but

in reality without such, but with a view to having them hired by any one from the public streets.

The manner in which the business is conducted determines whether it is a private or public hack business within the definition of the ordinances. One who is maintaining a private livery or garage may solicit business upon the streets, and thereby engage in the business of a public hack, and be subject to the regulation of the ordinances. In the case of City of Brooklyn v. Breslin, 57 N. Y. 591, it was held that one who had carts for his own business, but undertook to let them out for hire, thereby pursued a separate and independent business as a cartman and was required to obtain the license prescribed for such business. So a private liveryman may not, under the guise of conducting a private business, engage without a license in a public hack business as defined and where he undertakes to send or station his cabs in front of hotels, restaurants, theaters, or other places and there solicit passengers who have made no selection and given no order pursuant to which the cab has left the private stable or garage and is in attendance he is engaging in the public hack business. In the private livery or garage business the conveyance is sought by the passengers at the private property of the owner and not on the streets. The customers may go in person or send a messenger, letter, or telephone. Their selection may be due to the convenience of maintaining a charge account, because of a preference for a particular kind of vehicle or by reason of confidence in the drivers employed; but, whatever the reason may be, the business is a private business as distinguished from that of a public hack business, which by the ordinance has been limited to soliciting business upon the streets.

The same distinction was made by Montague Smith, J., in Allen v. Tunbridge, supra, 485, when he said with respect to Clarke v. Stanford:

"It appears to have been held there that, if the proprietor of a carriage sends it to a place for the purpose of picking up passengers, that is a plying for hire within the act. That is very different from a customer going to a jobmaster to hire a carriage."

The operator of a motor vehicle exercises a privilege and not a right, and the Legislature has the power to prescribe the conditions under which the privilege shall be exercised. Yellow Taxicab Company v. Gaynor, 159 App. Div. 893, 895, 144 N. Y. Supp. 299, Ingraham, P. J.; People v. Rosenheimer, 209 N. Y. 115, 102 N. E. 530, 46 L. R. A. (N. S.) 977, Ann. Cas. 1915A, 161. This authority is based upon a police power to regulate the use of the streets for the general welfare. As cities grew this regulation became necessary, both for the protection and the convenience of the public and has been recognized from time immemorial in England and since the establishment of the colonies in this country. Yellow Taxicab Company v. Gaynor, 82 Misc. Rep. 94, 143 N. Y. Supp. 279, citing Lord Chief Justice in De Portibus Maris, Harg. Law Tracts, 78; People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682, 5 L. R. A. 559, 15 Am. St. Rep. 460, affirmed Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247; Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77.

There can be no question that the board of aldermen, under the authority vested by the Legislature and the Greater New York Charter, has power to provide ordinances for the regulation of the use of the streets by any vehicle, mechanically driven or otherwise, and whether it has or has not a taximeter affixed, and whether it is used as a private or a public livery, or engaged on the street, at a railroad station, or at a private garage or elsewhere.

It is contended that it was the purpose of the framers of the ordinance to apply these regulations to all mechanically driven vehicles plying for hire or using the streets in the city of New York. If this be so, appropriate language has not been used to formulate such purpose. The following are subject to regulation, under the existing ordinances: (1) All owners and drivers of vehicles which have taximeters affixed and who use the streets of the city for the purpose of carrying passengers for hire, whether they solicit the passengers in a private or a public place and whether they are hired at private garages or elsewhere. (2) All owners and drivers of vehicles either with or without taximeters who ply for hire and solicit or attempt to solicit public patronage or passengers upon the streets. The regulations contained in the ordinances do not apply to the owners or drivers of vehicles which have no taximeters and who solicit patronage or are hired upon private property.

The Century Dictionary and Encyclopedia defines the word "ply" as meaning "to offer one's services for trips or jobs, as boatmen, hackmen, carriers," etc. Therefore the words "plying for hire" would, if unlimited, include a solicitation of patronage, not only upon the streets, but also a solicitation of patronage at railroad stations or upon other private property. Under the authorities already cited, there may be a question, however, whether the words "plying for hire" would include a vehicle in a private garage or upon a man's own premises, which was ready to go out for hire, but which did not solicit business, unless to the words "plying for hire" were added such words as "or hired at any stable, garage, or elsewhere."

But in each of the sections of the ordinances with respect to hacks, cabs, and taxicabs, the words "plying for hire" or "soliciting for hire" have been limited to such plying or solicitation upon the streets or public thoroughfares. So the definition in section 80, subdivision 1, defining a public hack, contains the clause "for which public patronage is solicited *upon the streets.*" Section 83 provides:

"No public hack shall ply for hire *upon the streets* of the city without first obtaining a license from the commissioner."

And section 109, entitled "Violations," contains the phrase "solicits for hire passengers *upon the streets.*"

In conformity with the views expressed herein, the judgment in each of the cases under consideration must be reversed, and the fines remitted.

Judgment reversed.