## COURT OF GENERAL SESSIONS — NEW YORK COUNTY.

### January, 1917.

### THE PEOPLE v. EDWARD MAY.

### THE PEOPLE v. JOHN W. MENKIN.

### THE PEOPLE v. OTTO PUTNEY.

### THE PEOPLE v. LOUIS BRAND.

### THE PEOPLE v. HENRY WAGNER.

### THE PEOPLE v. CHARLES RUBINS.

(98 Misc. 561.)

CITY OF NEW YORK—CODE OF ORDINANCES OF—§§ 80(4), 99, 106—WHAT IS MEANING OF "PUBLIC HACK"*—APPEAL—EVIDENCE—CRIMINAL LAW.

A sight-seeing car when engaged in soliciting public patronage is a "public hack" within the meaning of section 80 of the Code of Ordinances of the city of New York, and the provisions of section 106 thereof prohibiting a public hack while awaiting employment to stand on any public street or place other than at or upon a public hack stand apply to such a vehicle.

A public hack stand designated by the commissioner of licenses as authorized by section 99 of the said Code is a "fixed locality" within the meaning of section 80(4) thereof.

Where on appeal from a judgment of conviction for a violation of said section 106, generally known as the public hack ordinance, adopted March 23, 1915, and approved March 30, 1915, the evidence shows

* See Note, Vol. 32, p. 231.

that defendant maintained a sight-seeing car in front of his office or depot for the purpose of awaiting its employment by passengers, and it also appears that said office or depot had not been designated and established as a public hack stand, by the commissioner of licenses, pursuant to said section 99, the judgment of conviction will be affirmed.

APPEALS by defendants from a judgment of conviction of a City Magistrates' Court.

*Uterhart & Graham (Henry A. Uterhart, of counsel), for appellants.*

*Lamar Hardy, Corporation Counsel (Terence Farley, George P. Nicholson, of counsel), for People.*

ROSALSKY, J.:

The defendant in each of the above cases appeals from a judgment of the City Magistrates' Court convicting him of a violation of section 106 of chapter 14 of the Code of Ordinances of the city of New York, generally known as the public hack ordinance, adopted March 23, 1915, and approved March 30, 1915.

As the appeals of the six defendants involve the construction of the same sections of the ordinance, it will be sufficient to discuss in a single opinion the questions raised. The pertinent parts of the ordinance, in so far as the same are applicable to the facts under consideration, are as follows:

" § 80. Definitions. Unless otherwise expressly stated, whenever used in this article, the following terms shall respectively be deemed to mean:

" 1. Public hack, a vehicle plying for hire, for which public patronage is solicited upon the streets;

" 2. Cab, a public hack so designed and constructed as com-

fortably to seat, in the opinion of the commissioner of licenses, not more than two persons inside thereof;

" 3. Coach, a public hack so designed and constructed as comfortably to seat, in the opinion of the commissioner of licenses, 4 or more persons inside thereof;

" 4. Sight-seeing car, a motor-driven vehicle designed to carry 7 or more persons from a fixed locality to points of interest about the city.   *   *   *

" § 99. Hack stands.   *   *   *

" 2. Designation of stands.   The commissioner is hereby authorized to locate and designate, as public hack stands, the space alongside the curb adjacent to property used as public parks, public buildings, railroad stations, steamship and ferry landings, hotels, restaurants, theatres, and the centre of any street where the roadway, exclusive of the sidewalk, is 30 feet in width or more.   The commissioner may also designate the space beside the curb, adjacent to subway entrances and elevated railway steps, as stands for a limited number of public hacks. The commissioner shall further designate the number of such public hacks that shall be allowed to stand at any of the places designated by him, and the department shall provide a metal sign, which shall be attached to a post or stanchion adjacent to the said stand, and on which sign shall be placed the number *and kind of vehicles allowed on that particular hack stand. Owners of any property may apply to the commissioner for the establishment of a public hack stand, adjacent to their premises,* stating in said application the number of public hacks they desire to come on said stand, and also the kind of locomotion to be used, whether gasoline, electric motor or horses.   *Such application shall be granted solely in the discretion of the commissioner, and may be revoked by him at any time.*   There shall be delivered to the owner of the property making such application a metal sign, to be fixed to a stanchion on the curb or other conspicuous place, setting forth *the kind of public hacks*

*and the* number thereof that will be allowed on said stand. (Id., art. V.)

" § 100. Regulation of hacks at stands.  Only public hacks, in such numbers and of such kinds as are set forth on the metal sign, may remain at the stand while waiting for employment, and only in single file, pointed in accordance with the traffic regulations."

" § 106. ' Cruising; ' soliciting.  No public hack, while waiting employment by passengers, shall stand on any public street or place other than at, or upon a public hack stand, designated or established in accordance with this article."

The first public hack ordinance was enacted by the board of aldermen May 27, 1913.  It was approved by the mayor June 2, 1913, and became a law August 1, 1913.  Thereafter the board of aldermen, on March 23, 1915, adopted an ordinance which was approved by the mayor, March 30, 1915, whereby the entire general ordinances of the city were codified and incorporated into the Code of Ordinances of the city of New York. By this enactment the public hack ordinance became article 8 of chapter 14 thereof.  It is substantially the same as the prior hack ordinance, with the exception of some slight changes in phraseology and some amendments which do not in anywise affect the questions to be determined.

The record discloses that at the time of and prior to the passage of the first public hack ordinance there were a number of companies and individuals engaged in the business of maintaining sight-seeing cars and soliciting passengers in front of their offices or depots, without molestation or hindrance on the part of any of the public authorities, and that at schedule times these passengers were taken to points of interest about the city.

Each of the above-named defendants was charged with maintaining a sight-seeing car in front of his office or depot for the purpose of awaiting its employment by passengers, the office or depot where the sight-seeing car stood for such purpose not

being a public hack stand designated and established by the commissioner of licenses pursuant to section 99 of chapter 14 of the public hack ordinance.

These appeals bring up for consideration the following questions:

*First.* Is a sight-seeing car a public hack within the meaning of section 80, *supra?*

*Secondly.* Do the provisions of section 106, *supra,* prohibiting a public hack while awaiting employment by passengers to stand on any public street or place other than at or upon a public hack stand, apply to sight-seeing cars?

The defendants call attention to the fact that subdivisions 2 and 3 of section 80, defining " cab " and " coach," specifically employ the term " public hack," notwithstanding that, in subdivision 1 of that section, a public hack is defined as " a vehicle plying for hire for which public patronage is solicited upon the streets." They show further that no reference to the term " public hack " is contained in subdivision 4, which defines a sight-seeing car as " a motor driven vehicle, designed to carry seven or more persons from a fixed locality to points of interest about the city."

The defendants, therefore, contend that the omission of any reference in subdivision 4 to the term " public hack," in these circumstances clearly negatives the conclusion that it was the intent of the board of aldermen to embrace the sight-seeing car within the category of a public hack. In other words, the specific language defining in detail the exact nature and purpose of a sight-seeing car should not be controlled by the general language defining a public hack.

The defendants' construction of the ordinance is too restrictive and technical: Under its provisions the board of aldermen sought only to impose certain conditions and restrictions upon the owner or operator of a sight-seeing car who maintains it on the public streets for the purpose of soliciting public patron-

age, but it made no attempt to regulate the business of an owner of such a vehicle who maintains it in front of his place of business or depot for a period no longer than is necessary to take and discharge passengers.

As to the right to use the public streets for the latter purpose, see Cohen v. City of New York (113 N. Y. 532).

When subdivisions 1 and 4 of section 80 and section 106 are read together, it will be found that the board of aldermen provided a clear and ample test of determining whether a sight-seeing car comes within the definition of a public hack, and that test is *the use to which the vehicle is put.*

If a sight-seeing car solicits public patronage on the streets, then it comes under the regulation of the public hack ordinance, and the owner or operator thereof must comply with its provisions as set forth in section 106 (People v. Milne, 86 Misc. Rep. 417; People v. Harris, 87 id. 266; Clarke v. Stanford, L. R. [6 Q. B. 357], cited in People v. Cuneen, 94 Misc. Rep. 509; Mason-Seaman Transportation Co. v. Mitchell, 89 id. 230; affd., 168 App. Div. 915), and a failure to do so subjects the owner or operator of such vehicle to the punishment provided in section 109.

To hold otherwise would be to give to the ordinance an unnatural and meaningless construction and to defeat the intent and purpose of its framers.

The ordinance should not be so construed as to nullify it, if any other reasonable construction is possible for the accomplishment of its objects and purposes, provided, however, that it does not offend the canons of statutory construction.

I fully appreciate that the ordinance is penal in its character and therefore an offense cannot be established by implication, and that the rule of construction requires " that acts in and of themselves innocent and lawful, cannot be held to be criminal unless there is a clear and unequivocal expression of the

legislative intent to make them such." (People v. Phyfe, 136 N. Y. 554; Burks v. Bosso, 180 id. 341.)

In holding that a sight-seeing car when engaged in soliciting public patronage is a public hack, no attempt is made to enlarge the language of the ordinance so as to make penal that which is not plainly written in the ordinance itself. (§ 80, subd. 1, *supra.*)

The defendants claim that if every vehicle plying for hire, for which public patronage is solicited on the streets, comes within the purview of the public hack ordinance, extraordinary and absurd results would follow, inasmuch as trolley cars, elevated trains, express wagons and moving vans are vehicles plying for hire for which public patronage is solicited on the streets.

The whole intent and purpose of the ordinance clearly shows that it refers only to passenger-carrying vehicles of a public hack character.

A street car or an elevated train operates on tracks of a fixed route pursuant to a franchise granted therfor under special provisions of law. An express wagon or a moving van carries merchandise or freight, and neither has any relation to passenger-carrying vehicles. (See Expresses and Expressmen, chap. 14, art. 6; Public Carts and Cartmen, chap. 14, art. 11.)

It is asserted on behalf of the defendants that, even if a sight-seeing car should be held to be included in the term " public hack," it was never intended that it should be limited to soliciting public patronage on the streets, at a public hack stand only.

It is argued that if such construction be given, then the term " fixed locality " (§ 80, subd. 4, *supra*) has no meaning, for the reason that the commissioner of licenses does not issue any license to an owner of a sight-seeing car authorizing him to conduct business at a particular hack stand; except that the owner of such vehicle plying for hire on the public streets is

allowed to do business at one of a number of hack stands designated by the commissioner (§ 99, *supra*), providing that there is a vacancy for such vehicle.

It is further urged that in these circumstances the sightseeing car business would be thrown into a state of disorder and confusion, because a sight-seeing car might start its trip one day from a public hack stand at Twenty-third street and the next day find that stand occupied and be obliged to start from another at Forty-fifth street, and the day after find both of these stands occupied and be obliged to start from still another at Bryant Park. This, it is claimed, would not be carrying persons from a " fixed locality."

What is meant by " fixed locality " appears to be clear when the nature and purpose of the sight-seeing car is considered. It simply means a distinguishing feature of the classification of sight-seeing cars and other motor-driven vehicles, the former being operated or driven from a particular or fixed place to points of interest about the city, and, in the absence of a special arrangement, over a route determined upon or prearranged by the owner or operator of the car, the passenger or passengers having no say as to the specific places the vehicle should traverse, the latter being driven according to the instruction of their fare.

Mr. Justice SEABURY, in the case of Yellow Taxicab Co. v. Gaynor (82 Misc. Rep. 122; affd., 159 App. Div. 893), said: " The smaller cabs designed to carry a few persons are more generally engaged in transient business, while touring cars and sight-seeing vehicles designed to carry a larger number of persons are more generally employed to travel a fixed route between known points or are employed for a definite time at an agreed rate."

A public hack stand designated by the commissioner of licenses for sight-seeing cars is manifestly a fixed locality. The intent and meaning of this is that a sight-seeing car must start

from some fixed place; that is to say, it may start from any depot maintained by the owner provided no attempt is made to solicit public patronage on the streets, or it may start from any public hack stand designated for such purpose and where public patronage is permitted to be solicited on the streets.

It is well established that the board of aldermen is vested with power and authority to regulate how and in what manner the streets may be used by those engaged in the business of owning and controlling motor vehicles, for the purpose of soliciting public patronage on the streets, and, therefore, all persons engaged in such business must abide by the terms and conditions which the city imposes upon them. (Yellow Taxicab Co. v. Gaynor, 159 App. Div. 893.)

In this case, (supra), Presiding Justice INGRAHAM said: " By section 51 (amended by Laws of 1910, chap. 262) it is provided that subject to the Constitution and laws of the State the board of aldermen of the city of New York shall have power to provide for the licensing and otherwise regulating the business of public hackmen and cabmen; to regulate the rates of fare to be taken by owners or drivers of hackney coaches, carriages, motors, automobiles or other vehicles, and to compel the owners thereof to pay annual license fees. Under this power thus granted I think the Legislature intended to vest the board of aldermen of the city of New York with entire power to regulate the use of the streets of the city of New York, to regulate the nature of the vehicles that use the streets, and prescribe the conditions upon which they shall be allowed within the city limits, and with the unrestricted power to regulate the rates of fare to be charged by public conveyances using the streets. * * * .

" The Legislature having vested in the legislative department of the city of New York the power to regulate the streets in the city of New York and the use of motors and other vehicles using its streets, the legislative department of the city had the

power to prohibit the use of any particular kind of motors or vehicles that the welfare of the city, and its inhabitants, and the public generally in the use of the streets required. Thus, having the power to regulate, it had the power to prohibit, and the lesser power of imposing the terms upon which motors and vehicles should use the streets is included in the greater power to regulate the use of motors and vehicles using the streets."

It is urged that an adverse decision to these defendants will result in a great financial loss, not only to them, but to about one hundred other persons who have invested in the sight-seeing car business hundreds of thousands of dollars; that if those engaged in this business shall be required to operate only from public hack stands, persons coming from out of town will be unable to reserve accommodations in advance; and that in order to conduct business profitably to themselves and conveniently to the public it is essential that they be allowed to conduct their business as heretofore, namely, from in front of their offices or depots.

These suggestions may properly be addressed to the commissioner of licenses who has power to grant such relief rather than to the court, which is simply called upon to determine the validity of the ordinance, and to ascertain whether the defendants have violated any of its provisions.

Under the comprehensive powers vested in the commissioner of licenses, he may authorize the establishment of a public hack stand exclusively for the use of a person engaged in the sight-seeing car business in front of his office or depot, provided the owner of the property in which the business is located consents thereto. (Code of Ordinance, § 99.)

I have carefully considered the other objections made to the validity of the ordinance, but I have refrained from discussing them because, in my judgment, they do not affect the questions here decided.

As the evidence clearly shows that the defendants violated the provisions of section 106 of the ordinance, and as no error was committed affecting their substantial rights, the judgment of conviction as to each defendant is affirmed.

Judgment affirmed.